UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_Matthew Lowery_

## 13 CV 3957

(In the space above enter the full names(s) of the plaintiff(s).)

**COMPLAINT**
under the
Civil Rights Act, 42 U.S.C. § 1983
(Prisoner Complaint)

-against-

1) 168th street Jamaica N.Y. **Home Depot USA**
2) Partap Patesh of Homedepot USA
3) Eric Gonzalez of Home Depot USA
→ "Partap Patesh" (individual and official capacity suite)
→ Eric Gonzalez (individual and official capacity suite)
4) Ramond Kelly N.Y. P.D Commissioner
5) 103rd precient police officer Joseph Caserta
→ P.O. Caserta (individual and official capacity suite)

Jury Trial ☑ Yes ☐ No
(Check one)

RECEIVED
JUN 07 2013
PRO SE OFFICE

(In the space above enter the full name(s) of the defendant(s). If you
Cannot fit the names of all of the defendants in the space provided,
please write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The names
listed in the above caption must be identical to those contained in
Part I. Address should be included here)

## I.  Parties in this Complaint

A.  List your name, identification number, and the name and address of your current place of
confinement. Do the same for any additional plaintiffs named. Attach additional sheets
of paper as necessary.

Plaintiff    Name _Matthew Lowery_
ID# _13A1581_
Current Institution _Great Meadow Correctional Facility_
Address _Box 51 Comstock New York 12821-0051_

B.  List all defendants' names. Positions, places of employment, and the address where each
defendant may be served. Make sure that the defendant(s) listed below are identical to
those contained in the above caption. Attach additional sheets of papers as necessary

RECEIVED
JUN 07 2013
PRO SE OFFICE

1

Defendant No. 1     Name _Home Depot USA_     Shied # _____
                    Where Currently Employed _____
                    Address _168th St Jamaica N.Y._

Defendant No. 2     Name _Partap Paresh_     Shied # _____
                    Where Currently Employed _168th St Home Depot_
                    Address _Jamaica N.Y._
                            _Store clerk_

Defendant No. 3     Name _Eric Gonzalez_     Shied # _____
                    Where Currently Employed _168th St Home Depot_
                    Address _Jamaica N.Y._
                            _Loss prevention_

Defendant No. 4     Name _Ramond Kelly_     Shied # _____
                    Where Currently Employed _N.Y.P.D_
                    Address _____

Defendant No. 5     Name _Joseph Caserta_     Shied # _____
                    Where Currently Employed _103rd precient_
                    Address _Jamaica Queens_

## II.    Statement of Claim:

State as briefly as possible the <u>facts</u> of your case. Describe how each of the defendants in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claim. Do not cite any case or statues. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    In what institution did the events giving rise to your clam(s) occur? _N/A_

B.    Where in the institution did the events giving rise to your claim(s) occur? _N/A_

C.    What date and approximate time did the events giving rise to your claim(s) occur? _____
      _March 25 2011 and January 2013_

2

## " FACTS "

On March 25th, 2011 while Lawfully in defendants store being Home Depot, at 168th St. in the City of New York, Town of Jamaica for the purpose of purchasing one of certain articles of merchanise, to wit, a drain trap, sold by defendant and while examining same prior to purchase, Defendant was Seized and Laid hold of by Perlap Perlish, acting as a Security Guard stating " I saw you put that pipe in your pocket, if you let me see the one behind your zipper, I'll let you keep them both". This Servant and Agent of defendant, employed by him and " Falsely Acting " under such color of the Law, wrongfully accused defendant of theft publicly and implied a homosexual cure.

Plaintif promptly reported the incident to the nearest door security officer-Receipt checker and exited the store with no further incident. Defendant Perlap Perlish of Home Depot Maliciously and Wickedly accused plaintif of stealing from defendant and combined defendants emotional anguish with the homosexual implication that He wanted to see the "pipe behind My zipper".

Defendant Eric Gonzalez of the same Home Depot on the same day called 911 and reported a Shoplifting for Perlap Perlish who then took the phone from Mr. Gonzalez to Falsify a shoplifting and create an Arm Robbery (see 911 call for Language of both employee

Defendant's P.O. Joseph Caserta reported to Home Depot. Mr. Perlop Perlish confirmed that He was acting under the color of Law as an Employed Security Officer (see exhibit A & police testimony). He then submitted a False Report (see exhibit B Perlish trial transcript) claiming to be Store Security and saying He saw thing, He admits at trial He didn't witness first hand. Also that He wrongfully accused Two other people (Perlop trial transcripts)

Defendant Perlop Perlish admittedly gave P.O. Joseph Caserta at the 103rd Precient an altered video (see Perlop's transcripts) containing nothing (see video). Defendant Perlop Perlish along with P.O. Joseph Caserta both acted in Bad Faith. By Mr. Perlop supplying P.O. Caserta with False information and P.O. Caserta conducting no investigation of the facts from any other store employee. At trial P.O. Caserta admittedly openly acknowledged that He Falsifed the criminal complaint (see exhibit C for language) P.O. Caserta desired to make a Felony arrest instead of viewing the evidence. There was no evidence of any crime of Robbery in the First degree. The call was for Shoplifting. There was no vide footage other then what was doctored by Perlop Perlish admittedly

Four (4) hours later plaintif was arrested and charged with an Armed Robbery of Home Depot, and imprisoned awaiting trial to face my accussor for crimes I never even knew about.

At Trial on March 27th, 2013, which is the cause of this action Perlop Perlish Lied about being security. He lied about Home Depot's Store Policy regarding addressing theft. (see His entire trial transcripts).

He gave an affidavit to a private investigator blaming Eric Gonzalez (see exhibit D). He admittedly dealt with the security sytem several times. He admittedly left the store for I.D. purpose as an agent for Home Depot.

(1)

3

As He Blamed Eric Gonzalez after the investigation began P.O. Caserta Quietly Removes Eric Gonzalez from the entire equation to conceal the Purjury of Vouchering a Robbery Video (see video voucher) knowing No Robbery accured and P.O. Caserta also specifically candidly created a Maticulously written criminal complaint that He admitts at trial was False !

Because of Eric Gonzalez who called 911 (but obviously later decided not to participate in this conspiracy) and Perlop Perlish of Home Depot. Perlop Lied on the witness stand. He was acting well Beyond his employment status.

See Home Depot Theft Policy and compare what Perlop said the policy says "We see something We address". He even adds there's a specific policy about Him addressing people with guns.

How does a Sale Assistant have access to regulate video recordings, call 911, speaking on the phone, leave the store in search of suspects ? A store clerk says He thought He saw someone shoplifting. This suite is Based on Home Depot's employees outrageous Behavior. The Mental anguish became unbearable at trial on March 27th, 2013, where upon I was found Guilty of Arm Robbery.

No 911,
No I.D.,
No Video,
No Money,
No Property,
No Supporting Depositions,
No Witnesses.

### P.O. JOSEPH CASERTA

Held the defendant in the 103rd precient 8 hours directly accross the street from said Home Depot, Never any I.D. procedure. Falsly accused me of attempted Murder (see criminal complaint #2)

P.O. Caserta Lied, stating "Defendant admitted crimes for Attempted Murder and Robbery. P.O. Caserta Admitted at trial He took no notes. He even said He didn't know who called 911 at Home Depot (see pretrial), He also said He didn't know if the alleged isles in Home Depot had cameras...EVERY AMERICAN BREATHING KNOWS HOME DEPOT ISLES HAS CAMERA. P.O. Caserta Purposely Refused to acknowledge He saw the camera view, thats his Job ! But it showed No Robbery, so He would Have Been Caught in Perjury, as He had already Faslifed the Factual part of an Accusary Instrument. Because of Perlop Perlish of Home Depot Security (see Indictment for language) and P.O. Joseph Caserta.

Mr. Perlish was not acting within the scope of His employment see Home Depots Theft Policy, yet at trial He proves this (see Trial Transcripts, and exhibits). Employee Negligent Home Depot Employee.

P.O. Caserta Falsified the Felony Complaint entirely from his own imagination and thus Prejudicing My entire case at trial. These Two Men combined ties Malice and Treachery Resulted in the Plantifs Pain and Suffering, Denial of Liberty and Freedom in the form of 25 year Prison setence.

After Trial I began taking Psych Medication. I can't Believe

(2)

4

These people could Be So Wicked and Evil, I'll suffer for 25
Years from the Trial of March 2013 when I thought they would Have
The Decency To Tell The Truth, That day they both Presented
False Testimony in order to Further the Harm of the Plaintif Pain
and Suffering the created Two Years Prior and Continued until
Trial March 2013. Daniel Taylor never at any point called all see all can
for proof of P.O casertas Maliciouse lie. P.O Caserta threated the
Plaintif on several occasions prior to this situation. He falsified a number of
police document. Raymond Kelly is Responcible for inadequate training as is
Home depot.

## Exhibits attached

1 Pretrial exhibit P.O caserta

2 trial exibhits P.O caset and P. patesh

1 Affidavit from P.I

1. Fellony complaint Dismissed

1 page of complaint

1 endictment

1 fellony complaint convicted

all included. Here in

5

Continuation of Facts

D.    Facts: The Police Files along with court record will reflect That for two years Ratesh perlap acting as a "security agent" wile being employed as a sales associate, did act willfully and knowingly as an agent of Home depot beyond his bounds of employment with malicious and harm full intentions. He (perlap) manipulates' 911 call, video evidence, and advises on security matters all under the umbrella of Home depot loss prevention. He includes Eric Gonzal who reported this incident as a shoplifting but fail to appear at trial to articulate the facts associated with his employment as well as Home depot's store policy regarding theft which both even ignured making Home depot usA liable in inadequate training and responcible for my present incarceration. and utimately my mental state of depression which ultimately lead to a suicide attempt on Rikers.

P.O casetta say lying isn't considered a mistake at trial were court record will reflect. He lied in three areas of the felony complaint. He also included Eric Gonzalez with perlap perlish to enhance his creation of a Robbery, He saw video abdantfeat and he still added criminal discriptions in his own language and idea to secure a fellony conviction as aposed to the initial 911 call. He also falsifed police complaint forms and lied about what Mr Gonzalez toll Him. He even denied knowing who called 911 wee he reached Home depot. Two fellony complaint He falsified as well He is inadequatly trained, thus making Raymond Kelly liable as well. 14th Amendment violation(s)

III.    Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. For pain and suffering mental anguish I was prescribed RiMRahm. wrong full imprisonment. I now take psych medication because of the 25 years imprisonment these two men have caused me.

IV.    **Exhaustion of Administrative Remedies:**

The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any or Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Administrative remedies are also known as grievance procedures.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

Yes ✓ ½ No ✓

it started in the street and continued at trial (wile in jail)

6

If YES, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s). OBCC Rikers Island (for trial)

B.    Does the jail, prison or other correctional facility where your claim(s) arose have a grievance procedure?

Yes ___✓___    No _____    Do Not know _____

C.    Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all your claim(s)?

Yes _____    No ___✓___    Do Not know _____

If YES, which claim(s)? _____

D.    Did you file a grievance in the jail, prison, or other facility correctional where your claim(s) arose?

Yes _____    No ___✓___

If NO, did you file a grievance about the events described in this complaint, where did You file the grievance?

Yes _____    No ___✓___

E.    If you did file a grievance, about the events described in this complaint, where did you file the Grievance? N/A _____

1.    Which claim(s) in this complaint did you grievance N/A _____

2.    What was the result, if any? N/A _____

3.    What steps, if any, did you take to appeal that decision? Describe all efforts to appeal to The highest level of the grievance process. _____

_____
_____
_____
_____
_____
_____

7

F.  If you did not file a grievance:
 1.  If there are any reason why you did not file a grievance, state them here: _N/A_____
 _____
 _____
 _____
 _____.

 2.  If you did not file a grievance but informed any official of your claim, state who you in informed, when and how, and their response, if any: _about Partap Perlish_
 _March 25th 2011 & told store security at the_
 _Entrence/Exit that partap contrivted ne laid_
 _hard on ne and asked to see my genintals_

G.  Please set forth any additional information that is relevant to the  exhaustion of your administrative remedies. _____
 _____
 _____
 _____
 _____

Note:  You may attach as exhibits to this  complaint any  documents related to the exhaustion of your administrative remedies. _Exibits included (some)_

V.  **Relief:**

State what you want the Court to do for you (including the amount of monetary compensation, if any, That you are seeking and basis for such amount). _From Home depot for inadaqrate_
_training and vidlation of store police By it agents causing pain_
_suffing mental anguiste acting, as false security officer under the_
_color of Home depot security 25 million dollars, a million for each_
_year I was sentenced to. I would allso like to sue partap_
_Parlesh in individual and official capacity. For 25 million. For causing_
_This entire situation out of malice._

_Ramond Kelly as commissioner knowing the policy for police_
_Falsification, purjury, altered evidence. admitted Falsification_
_of fellony complaint. 25 million Dollars._

_P.O. Caserta, Joseph at 103rd precient individualy and_
_in official capacity. 25 million_

_TO TOTT al 100.000.000.00_
_for the mental anguish and pain and suffing_

8

**VI.    Previous lawsuit:**

On
these
claims

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

Yes __✓__   No _____

B.    If your nswer to A is yes, describe each lawsuit by answering questionings 1 through 7 below. (If there is more than one law suit, describe the additional lawsuits on another sheet of paper, using the same format.)

1.    Parties to previous lawsuit:

Plaintiff _Matthew Lowery_

Defendants _Warden A.M.K.C C-95 Rikers Island_

2.    Court (if federal court, name the district, if state court, name the county) _____
_Souther district_

3.    Docket or index number _# 13-CV-2879 (UA)_

4.    Name of Judge assigned to your case _N/A_

5.    Approximate date of filing lawsuit _4-23-2013_

6.    Is the case still pending?  Yes __✓__  No _____

7.    What was the result of the case? (For example: Was the case dismissed? Was there Judgment in your favor? Was the case appealed? _N/A_
_____
_____

On
other
claims

C.    Have you filed other lawsuits in state or federal court otherwise relating to your imprisonment?

Yes _____   No __✓__

D.    If your answer to C is Yes, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, Using the same format.)

1.    Parties to previous lawsuit:

Plaintiff _____

Defendants _____

9

2.    Court (if federal court, name the district, if state court, name the county) _____

_____

3.    Docket or index number _____

4.    Name of Judge assigned to your case _____

5.    Approximate date of filing lawsuit _____

6.    Is the case still pending?  Yes _____   No _____

7.    What was the result of the case? (For example: Was the case dismissed? Was there Judgment in your favor? Was the case appealed? _____

_____

_____

**I declare under penalty of perjury that the forgoing is true and correct.**

Signed this __15__ day of __May__, 20 _13_.

Signature of Plaintiff _____

Inmate Number _13A1581_

Institution Address _Box 51 Comstock N.y. 12821_

Note:  All plaintiffs named in the caption of the complaint must date and sign the complaint and provide their inmate numbers and addresses.

I declare under penalty of perjury that on this _15_ day of __May__, 20 _13_, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff _____

10

Pre-Trial

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF QUEENS: CRIMINAL TERM, PART K-23

3  ————————————————————X

4  THE PEOPLE OF THE STATE OF NEW YORK,              Indictment No.

5         -against-                                  845-11

6  MATTHEW LOWERY & DANIEL TAYLOR,                   HEARING

7            Defendant.

8  ————————————————————X

9                                    February 16, 2012
10                                   125-01 Queens Boulevard
                                     Kew Gardens, New York 11415
11

12  B E F O R E :

13       HONORABLE JOEL L. BLUMENFELD,

14                                         Justice,

15

16  A P P E A R A N C E S :

17  FOR THE PEOPLE:

18     RICHARD A. BROWN, ESQ.
       District Attorney, Queens County,
19     BY:  MARK MISOREK, ESQ.
            Assistant District Attorney
20

21  FOR THE DEFENDANT:

22     DENNIS COPPIN, ESQ. (Lowery)

23     EDWARD MUCCINI, ESQ. (Taylor)

24

25
                              **GAIL J. NEUFELD, RPR**
                              OFFICIAL COURT REPORTER

                                                              gjn

PO JOSEPH CASERTA - People - Cross (Muccini)                    76

1    Q    They were in the back seat of the vehicle?

2    A    They were in the back seat.

3    Q    And Mr. Gonzalez actually identified Mr. Taylor?

4    A    Yes, he did.

5    Q    Was it your understanding that Mr. Gonzalez saw the

6    alleged robbery take place in the plumbing aisle?

7         A    My understanding of it was Mr. Parlesh was, the gentleman

8    that was involved, which he was, and Mr. Gonzalez was just in the

9    vehicle at the time of the Parlesh's identification?

10        THE COURT:    He is asking how would Gonzalez know.

11        THE WITNESS:    I understand the question.  I understand

12        the question.  I just approached the vehicle, they both said

13        that's him, one hundred percent.

14   Q    You didn't ask Mr. Gonzalez how he knew?

15   A    No.  Mr. Parlesh, like I said, one hundred percent said

16   it was him.  Mr. Gonzalez said it was him.

17   Q    In front of you, all Mr. Parlesh said was that's him, he

18   didn't say anything else?

19   A    One hundred percent, that's him.

20   Q    That's him, okay.

21        THE COURT:    Do you know if Gonzalez saw any of this going

22        down while he was sitting in his office?

23        THE WITNESS:    I do not.  We reviewed the tape with him.

24        THE COURT:    You didn't see it?

25        THE WITNESS:    You can't see down the aisle.  The camera I

*Pre-trial excerpt Feb 16th 2012*

PO JOSEPH CASERTA - People - Direct

15

*Perlap*

1    some point at the Home Depot, can you tell the Court what you did?

2        A    At that time when we approached the location, we looked

3    for the complainant -- the complainants were in the back of the

4    location.

5        Q    And did you come to find out the names of the

6    complainants?

7        A    Yes, I did.

8        Q    And can you just tell the Court their names?

9        A    Their names was Eric Gonzalez and a Paulette Parlesh.

10       Q    Did you interview one, both, none?

11       A    Both.

12       Q    And just describe for us how the interview went, what did

13   you say; what did they say?

14       A    When we approached the location, we finally found the

15   complainants a, Mr. Eric Gonzalez was in charge of loss prevention

16   there.  He was the one with the videotape, of the surveillance in

17   the area; and Mr. Paul Perlish was the gentleman from loss

18   prevention that approached the two suspects and was shown a firearm

19   at the time.

20       Q    All right.  If you could, specifically with regard to the

21   conversation with Parlesh, describe the conversation as best you

22   can in detail?

23       A    Mr. Parlesh informed me he approached the two suspects at

24   the location and that ██████████ was shoving drains down his

25   pants.

PO JOSEPH CASERTA - People - Direct

(21)

*[handwritten: Delap Outside Of Home Depot on security matters.]*

1      Q      All right.  What did you do at that point?

2      A      At that point we waited for the other vehicle to pick up

3   the two complainants, then Mr. Parlesh and Mr. Gonzalez, at which

4   point they came to the location, gave a positive ID on the young

5   lady and Mr. Taylor.

6      Q      Okay.  And can you describe for us -- slow it down -- and

7   describe for us specifically how that happened, where were they

8   when they first arrived at the location?

9      A      We had the gentlemen stopped at 160 and 107.  I called my

10   sergeant, he went to go pick up the two complainants, he brought

11   them from the Home Depot to 160 and 107 Avenue.

12             At that point, they made a positive identification of the

13   suspect.

14      Q      Did the complainant speak to you at that point?

15      A      Yes, he did.

16      Q      Which complainant are we talking about?

17      A      Mr. Gonzalez and Mr. Parlesh.

18      Q      And what did they say to you at that point?

19      A      They said:  That's the gentlemen who robbed us.

20      Q      And did they make any reference to a lady at that point?

21      A      Yes, they did.

22      Q      What did they say?

23      A      They said that is the getaway driver.

24      Q      Now after that was done, what was done in terms of

25   Mr. Taylor at that point?

gjn

PO JOSEPH CASERTA - People - Cross (Muccini)

*[handwritten margin note: Perlap. Home Depot security or Loss Prevention!]*

1     Q     Okay. And any of them wearing a security guard
2  or anything like that?

3     A     I don't believe so, sir.

4     Q     None of them carry weapons right?

5     A     No, sir.

6     Q     All right.

7     A     I don't believe so, sir.

8     Q     Okay. And which of these two individuals was the one
9  that allegedly saw this incident in the plumbing aisle?

10     A     Mr. Parlesh.

11     Q     Okay. And how long was your conversation with
12  Mr. Parlesh?

13     A     Approximately 15 minutes.

14     Q     And what did Mr. Parlesh say specifically about the
15  actions of Mr. Taylor, the guy in the blue hoodie?

16     A     He said that he was a lookout.     *[handwritten: Not stealing]*

17     Q     He used those specific words?

18     A     He used those specifics words, yes.

19     Q     Did you ask him exactly what the guy in the blue
20  sweatshirt was doing?

21     A     I did not. He was, like I said, he was visibly upset
22  almost at a point of being sick so when he said he was his lookout,
23  I took his word for it.

24     Q     Okay. So with respect to the guy in the blue sweatshirt,
25  the only thing he said, the only thing that Mr. Parlesh said that

gjn



58

PO JOSEPH CASERTA - People - Cross (Muccini)

1 Lawyer Q    Who came and got you?

2 cop A    Mr -- excuse me, the cashier brought me to the back.

3 Lawyer Q    Okay. And in the back you spoke with two individuals,

4 right?

5 cop A    Yes, sir.

6 Lawyer Q    Mr. Parlesh — What's the individual's name you spoke to?

7 Cop A    There was two; there was Eric Gonzalez and Paulette

8 Parlesh.

9 Lawyer Q    Now, Mr. Parlesh is it?

10 Cop A    Yes, sir.

11 Lawyer Q    Parlesh, is he one of the individuals at Home Depot that

12 wears the orange apron and walks around the store?

13 ➤ A    He is a loss prevention person that works there.

14 Judge ➤ THE COURT:    What was he wearing the day you spoke to him?

15 Cop THE WITNESS:    I don't remember what he was wearing.

16 Judge ➤ THE COURT:    So he is not just a person that works at Home

17 Depot in the aisles helping people out, is he?

18 Cop THE WITNESS:    I don't believe so.

19 Judge ➤ THE COURT:    So he actually has a title, loss prevention

20 agent or representative?

21 Cop THE WITNESS:    Employee. I believe so. He is from the

22 loss prevention.

23 Lawyer Q    And then this individual Eric Gonzalez, what is his job

24 description, if you know?

25 Cop A    I believe he is as well, loss prevention.

Perlap
43

PO JOSEPH CASERTA - People - Cross (Coppin)

1    he run to?

2        A      I am not a hundred percent positive where he ran to.

3        Q      Okay.

4        A      Because, like I said, it took a couple minutes for to us

5    get there but when we got there, he was in the back room.

6        Q      Now the description is given based upon Mr. Parlesh —

7    Mr. Gonzalez looking at this tape, or is the description we get

8    based upon his observations during the course of the incident; do

9    you know?

10       A      Like I said, Mr. Parlesh had a very close conversation or

11   had a conversation up close with the two gentlemen, so he gave us

12   the script.  The first script when we were able to watch the video,

13   we were able to see more in depth what they were wearing.

14       Q      I am saying, you got this 911 description, correct?

15       A      Yes, sir.

16       Q      Okay.  Did you ask him was the description from

17   Mr. Gonzalez based upon his looking at the tape or was it

18   Mr. Parlesh, based upon his description and coming in contact with

19   these people; do you know?

20       A      I don't know exactly who called 911, sir, to give the

21   script.  I know when I got there, Mr. Parlesh gave the script.

22       Q      Okay.  Had Mr. Parlesh viewed the tape already with

23   Mr. Gonzalez?

24       A      I do not know that, sir.

25       Q      Okay.  But you viewed the tape then with them both?

gjn

PO JOSEPH CASERTA - People - Cross (Coppin)

1    Q    Inside of his pockets?

2    A    Yes, sir.

3    Q    And how close does he get to the man in the camouflage,

4    the person in the camouflage when he says that this weapon is

5    flashed?

6    A    I'm not sure, sir.

7    Q    And did he have words with the person, was there any

8    argument, anything like that?

9    A    No.  Once the firearm was flashed, he took off, he left.

10    Q    He runs away?

11    A    He runs away.

12    Q    So there is no words or anything like that, sees a weapon

13    flashed then he takes off?

14    A    I believe so, sir, yes.

15    MR. MISOREK:    I would just ask for a clarification on who

16    "he" is in that.

17    Q    The person walks up to the person in camouflage, correct?

18    A    Yes, sir.

19    Q    And then Mr. Parlesh says a weapon is flashed, correct?

20    A    Yes, sir.

21    Q    And then he takes off, he runs --

22    A    Mr. Parlesh, yes.

23    Q    -- correct?

24    A    Yes, he runs.

25    Q    And where does he run, to the security room; where does

gjn

PO JOSEPH CASERTA - People - Recross (Coppin)                    84

1          prevention, yes, sir.

2                    THE COURT:    Anything else?

3          Q      Is he the same as Mr. Gonzalez; were they dressed the

4    same?

5          A      I don't know that, sir.

6                    MR. COPPIN:    Nothing further, Judge.

7                    THE COURT:    Anything else?

8                    MR. MUCCINI:    Just one.

9    RECROSS EXAMINATION

10   BY MR. MUCCINI:

11         Q      Officer, when you arrived at the corner of 160th and

12   107th --

13         A      Yes, sir?

14         Q      -- isn't it a fact there was actually an ambulance at the

15   scene already and Mr. Lowery was walking towards — Mr. Taylor was

16   walking towards the ambulance when you stopped him?

17         A      No, sir.

18                   THE COURT:    Anything else?

19                   MR. MUCCINI:    No, your Honor.

20                   THE COURT:    Anything else?

21                   MR. MISOREK:    No, your Honor.

22                   THE COURT:    Thank you very much.

23                   THE WITNESS:    Thank you, sir.

24                   THE COURT:    Do you have any other witnesses?

25                   MR. MISOREK:    Not for today, your Honor.

*Tried*
*done transcript*
*depot employee*

*Mr. Patesh* - People - Direct

*Atual*
*Trial*

28

1          call Partap Patesh.

2    P A R T A P    P A T E S H,      a witness called by and on behalf

3    of the People, upon being duly sworn, testified as follows:

4              THE COURT OFFICER:  People call Partap Patesh.

5        P-A-R-T-A-P.  Last name P-A-T-E-S-H.  Resident of Queens

6        County.

7              THE COURT:  Good morning, Mr. Patesh.

8              THE WITNESS:  Good morning.

9              THE COURT:  Sir, I apologize but that microphone

10       is not working.

11             THE WITNESS:  Okay.

12             THE COURT:  Okay?  I'm going to ask you to speak

13       up very, very loud, as loud as you can and direct your

14       responses to the ladies and gentlemen of the jury, okay?

15             THE WITNESS:  I will.

16             THE COURT:  Mr. Misorek.

17   DIRECT EXAMINATION

18   BY MR. MISOREK:

19       Q    Good morning, sir.

20       A    Good morning.

21       Q    As you sit here today have you ever been convicted of a

22   crime?

23       A    No.

24       Q    I want to take you back to March 25th of 2011, at

25   approximately 11:20 in the morning, inside of 92-30 168th Street.

*Acting*
*beyond*
*scope of*
*employment*

                                                            lyc

Patesh - People - Direct

1  Can you tell the jury were you present at that date, time and

2  place?

3      A     Yes, I was.

4      Q     Could you just tell the jury what's that location to

5  you?

6      A     That's where I work.  I work for the plumbing

7  department at Home Depot.

8      Q     What county is that store located in?

9      A     That's in Queens County.

10     Q     Back then, back in 2011, can you tell the jury how long

11  had you been employed by that Home Depot?

12     A     I been with Home Depot, that specific store, for about

13  two years, but together with other stores, everything combined

14  about almost seven years.

15     Q     Back then approximately how much an hour did you make?

16     A     15 an hour.

17     Q     Inside that store, can you just describe the general

18  layout of the store for the jury?

19     A     Generally, this Home Depot is a very small store

20  compared to other Home Depots.  The pro desk is on the side in

21  the front.  The front entrance is where the self check out is.

22  My department, that's the plumbing, the next is the hardware

23  department and to my left there's electrical department.

24     Q     In terms of entrances and exits to the store are you

25  familiar with the contractor entrance/exit?

Patesh - People - Direct

1              THE WITNESS:  Aisle 10.

2         A    As I was walking aisle ten, I was helping customers on

3    the way, and I noticed two Africa Americans.  One was facing me,

4    he was wearing a blue hoody and the other guy was wearing a

5    camouflage jacket.  He was just grabbing stuff from the shelf and

6    just put it in his jacket.  He was taking about two or three at a

7    time because he was so big, you know, and his hand was huge.

8    Just grabbing items up in his jacket.  So I kindly went up to him

9    and I said, excuse me, sir, can you do me a favor, can you please

10   put back the items that you took back on the shelf.  He was like,

11   no.  He was like are you a police?  I was like, no, I'm not.  I'm

12   just a regular associate.  He was like, oh, well, he lives right

13   around the corner, if he has any problem -- if I have any

14   problem, he will come back for me at any time.  At the same time

15   when he told me that, he move his jacket to the side.

16              THE COURT:  Indicating the left side of the

17        jacket, moving backward.

18              THE WITNESS:  Correct.

19        A    And I saw the handle of a gun that was in his back.  So

20   you know, I step back as I turn around.  When I turn away, I was

21   going back, we have some vanity mirrors, you know, we had a set

22   that we had on top.  So I was walking back, I'm looking at the

23   mirror because I was scared.  You know what I'm saying?  There's

24   a gun, you know, I can't protect myself or anything.  So I'm

25   looking back to make sure that they don't come after me or

*Against store policy (dangerous?)*

Patesh - People - Direct

1    A    No.

2            MR. ROTHBERG:  Objection.

3            THE COURT:  Sustained.  Stricken.

4    Q    When you had the conversation with the defendant that

5    you just described for us, did he have a mask on?

6    A    No.

7    Q    Was his face covered in any way?

8    A    No.

9    Q    When you turned and walked back down the aisle you

10   indicated you were scared.

11   A    Correct.

12   Q    Did you call out for help?

13   A    When I made the right on the corner, yes, I picked up

14   my phone and I called the security.

15   Q    In terms of -- in terms of Home Depot policy, what's

16   the policy of Home Depot in terms of reporting these type of

17   incidents?

18           MR. ROTHBERG:  Objection.

19           THE COURT:  I will allow that.

20   A    We have to follow procedure, which we follow.  Anything

21   happen we have to let security know, which is Asset Protection.

22           THE COURT:  It's called what?

23           PROSPECTIVE JUROR:  Asset Protection.

24           THE COURT:  Asset Protection?

25           THE WITNESS:  Yes.

*He spoke
to Police
on the all call*
*See giving
Spec., ca'*
*call becomes 2nd*

37

Patesh - People - Direct

1    Q    Can you just explain what's generally the role of Asset

2    Protection just so we understand?

3    A    Asset Protection is any crimes committed against Home

4    Depot, shoplifting, etcetera, that we let them know what's going

5    on and they investigate it.    If someone trying to steal

6    something, they're the first to be involved.

7    Q    Is it fair to say Asset Protection is a fancy word for

8    security?

9    A    Correct.  Home Depot security.  Correct.

10    Q    To be clear you personally never called 9-1-1?

11    A    No.

12    Q    Now, at some point the police, the New York City Police

13    Department, they do respond, correct?

14    A    Yes.

15    Q    What did you do -- I'm sorry.

16        After you were walking down and making these

17    observations through the vanity mirror were you able to see

18    anything through the vanity mirror?

19    A    Yes.  The individual picked up his phone and called

20    someone.

21    Q    Which individual are you talking about?

22    A    The young gentleman in the camouflage jacket.

23    Q    At any point did you observe the defendant leave the

24    aisle?

25    A    Yes.

Patesh - People - Direct

1    Q    When did you observe the defendant leave the aisle?

2    A    When I was walking towards the back and I was looking

3    at the mirror, he just left, both of them left the aisle.

4    Q    In terms of their direction of traveling when they were

5    leaving the aisle, was that near -- was that -- I'm sorry.  I

6    will strike that.

7         In terms of their direction of travel, was that towards

8    any exit?

9    A    Yes, it was toward the contractor's exit.

10    Q    Once the individuals left the aisle and you reported

11   this to loss prevention can you tell the jury what did you do at

12   that point?

13   A    When they left the aisle, I called Asset Protection.

14   Q    At any point after Asset Protection was called, did you

15   begin to review security cameras?

16   A    Yes.

17   Q    And how long did you review security cameras for at

18   that point?

19   A    Probably 10, 15, 20 minutes, around there.

20   Q    At some point did the police arrive?

21   A    Yes.

22   Q    And is that while you're reviewing security footage?

23   A    Yes.

24   Q    Now, without discussing what was said, did you speak to

25   the police when they arrived?

Patesh - People - Direct

39

1      A      They asked me questions.

2      Q      Without saying what the discussion was, did you talk to

3    them?

4      A      Yes.

5      Q      When you were talking to them, what were you doing, if

6    anything, in terms of security?

7      A      I was looking at the footage on the security camera.

8             MR. ROTHBERG:   Your Honor, I would ask that this

9    be marked as People's 1 for identification.

10            THE COURT:   We can deem it as People's 1 for

11   identification for this purpose.   Just show it to the

12   witness.

13            (Whereupon, the item referred to is deemed marked

14   People's Exhibit 1 for identification.)

15            THE COURT:   It's been deemed.

16     Q      Take a look at that and I'm going to ask you what that

17   is.

18     A      Yes.

19     Q      What is that?

20     A      It's the DVD of the incident that happened.

21     Q      When you say the incident -- well, how do you know

22   that's a DVD of portions of the incident or the incident?

23     A      Because I have viewed it.

24     Q      When did you view it?

25     A      Today.

Patesh - People - Direct

1    Q    And how do you know that's the same DVD you viewed?

2    A    Because my initial.  I initialed it.

3    Q    Does that DVD contain every single piece of video

4    footage that you reviewed on date of the incident?

5    A    Not all of them.

6    Q    In fact, is it fair to say portions of it have been cut

7    out?

8    A    Correct.

9    Q    And portions, clips that you viewed on that day, are

10   also not on that DVD?

11   A    Correct.

12   Q    The portions that are on the DVD, do they accurately

13   and fairly depict what you viewed on that day?

14   A    Yes.

15   Q    In terms of the date, timestamp when you were viewing

16   the video on that day, did you observe the date timestamp on the

17   video?

18   A    Yes.

19   Q    How does the date timestamp on the DVD before you now

20   compare to the date timestamp on the video you viewed back on

21   that day?

22   A    It's the same timestamp.

23        MR. MISOREK:  With those caveats, your Honor, I

24   would ask that it be put in as People's 1.

25        THE COURT:  Mr. Rothberg?

Patesh - People - Direct

```
 1    Q    How did you view it?  Did you view it like on a TV set?

 2    A    We have -- yes, on the computers.

 3    Q    Okay.  Was a disk like this put in and that's what you

 4  saw?

 5    A    No, sir.

 6    Q    Tell me.  Tell me how you viewed it.

 7    A    Just we have on live cameras, we can -- we could go

 8  back to certain times and view certain incident that happen.

 9    Q    Okay.  Now, you told Mr. Misorek that you viewed this

10  this morning?

11    A    Yes, I did.

12    Q    Now, I believe you also told him, correct me if I'm

13  wrong, but I believe you also told him that there were certain

14  things that you viewed back in March 2011?

15    A    Yes.

16    Q    Right?  That were not on here?

17    A    Correct.

18    Q    Well, where are they?

19              MR. MISOREK:  Objection.

20              THE COURT:  Sustained as to that.

21              MR. ROTHBERG:  Well, he wants to put this in.

22              MR. MISOREK:  Objection to the narrative.

23              THE COURT:  He's making his objection.

24              MR. ROTHBERG:  This is not the entirety of the

25  footage.
```

Patesh - People - Direct

41

1             MR. ROTHBERG:  Brief voir dire?

2             THE COURT:  Of course.

3             MR. ROTHBERG:  Thank you.

4   VOIR DIRE

5   EXAMINATION BY MR. ROTHBERG:

6       Q    Good morning, sir.

7       A    Good morning.

8       Q    You said that on the date of the incident back in March

9   of 2011, you viewed security footage, correct?

10      A    Yes.

11      Q    All right.  When did you do that?

12      A    After the incident had happened, Home Depot Security

13  Asset Protection and I viewed the cameras.

14      Q    You viewed, right?

15      A    I was in the room also, yes, sir.

16      Q    So you viewed.

17           Now, did you -- did you view a tape like this or -- how

18  did -- what did you view?  How did you physically view this

19  surveillance footage?

20      A    At that time we have everything on camera.

21      Q    Okay.

22      A    Then this morning I viewed --

23      Q    No forget this morning.  I'm talking about back in

24  March of 2011.

25      A    Yes.

lyc

Patesh - People - Direct

1          THE COURT:  Correct.

2          MR. ROTHBERG:  And there might be some relevant

3     footage that he observed.  I want to know where it is

4     because to put this in may not be fair, if we don't have --

5          THE COURT:  We don't need the speech at this

6     point.  He's offering portions of a tape that he says are

7     fair and accurate portions of a tape with the understanding

8     that there are some portions that are not there.  This is

9     what he's offering though.  So the issue of where the other

10    things are are not relevant to your voir dire.  This is what

11    he's offering.  He's offering portions of the incident.  You

12    have it in front of you.

13         MR. ROTHBERG:  I think that we should see

14    everything.

15         THE COURT:  If you don't have the other things,

16    this is what he's offering.  What's your position?

17         MR. ROTHBERG:  My position is I object as --

18         THE COURT:  Being incomplete?

19         MR. ROTHBERG:  Potentially being incomplete and

20    being unfair.  Why did we cut certain things or -- I mean

21    let him explain it.

22         THE COURT:  You have an application, you can

23    perhaps pursue that on cross-examination if you'd like,

24    after reviewing that tape.  Over your strenuous objection,

25    I'm going to mark that as People's 1 in evidence.

Patesh - People - Direct

1                    (Whereupon, the item referred to, previously

2          deemed marked People's Exhibit 1 for identification, was

3          received and marked People's Exhibit 1 in evidence.)

4                    MR. ROTHBERG:  If I may ask one further question.

5                    THE COURT:  Don't forget you are going to have

6          cross-examination.

7                    MR. ROTHBERG:  Just so the jury is clear, we are

8          all clear.

9          Q      When we see this, that is not the entirety of what you

10   saw, you saw other things that day as well, correct?

11         A      Correct.

12         Q      That are not on that?

13         A      Correct.

14                   THE COURT OFFICER:  People's 1 marked and received

15         into evidence.

16   DIRECT EXAMINATION

17   BY MR. MISOREK:

18         Q      While we are on the subject of what's there and what's

19   not, did you ever make any efforts to go back and record all the

20   cameras that you viewed that day?

21         A      Yes

22         Q      How many times did you go back and attempt to record

23   all the cameras you viewed?

24         A      Couple of times.

25         Q      You put them -- attempted to put them on a DVD?

Patesh - People - Direct

1    A    Correct.

2    Q    Once you made that attempt where did you bring those

3    DVD's?

4    A    To your office.

5    Q    At my office, did you attempt to play them?

6    A    Yes.

7    Q    What happened when we attempted to play them?

8    A    It was not working.

9    Q    How many times did you do that?

10    A    Couple of times.

11    Q    This, People's 1 before you, you don't know how this

12    was obtained, do you?

13    A    Correct.

14    Q    People's 1 that you viewed this morning, there were

15    references to having parts cut out.  How many different cameras,

16    angles are on this DVD as you remember?

17    A    About five different angles.

18    Q    You viewed other camera angles on the date in question,

19    correct?

20    A    Yes.

21    Q    So in terms of portions being cut out, you viewed it

22    this morning, correct?

23    A    Yes.

24    . Q    And the portions cut out, literally cut out are just

25    the portions where nothing is relevant?

Patesh - People - Direct

1          MR. ROTHBERG:  No.  No.  No.

2          THE COURT:  I sustain it.  Are you making an

3    objection?  I'm sustaining it.

4          MR. ROTHBERG:  Well, first of all I'm sustaining

5    it for a number of reasons.

6          THE COURT:  No, you are objecting for a number of

7    reasons, not sustaining it.

8          MR. ROTHBERG:  There you go.

9          MR. MISOREK:  Judge, I would ask that People's 1

10   be played.

11         THE COURT:  Go right ahead.

12         (Pause.)

13         MR. MISOREK:  I will continue with my direct

14   examination and I will come back to it before I conclude.

15   DIRECT EXAMINATION CONTINUED

16   BY MR. MISOREK:

17   Q    You indicated the police at some time arrived back to

18   the Home Depot that day, correct?

19   A    Yes.

20   Q    Let's take it from there.  After you speak to them what

21   happened?

22   A    They took my information, and couple minutes later we

23   -- I went in the car with them.

24   Q    They drove you somewhere, right?

25   A    Yes.

Patesh - People - Direct                                           50

1     A    No problem.  Yes, sir.

2     Q    You are not store security, correct?

3     A    No, I'm not, sir.

4     Q    You said that there's a policy in place for a situation

5     when an employee, like yourself, sees somebody shoplifting,

6     correct?

7     A    Correct.

8     Q    By the way, you -- what would be your job description?

9     A    I'm a sales associate.

10    Q    So you're one of those guys who walks up and down the

11    aisles and ask people if they need help, correct?

12    A    Correct.

13    Q    You wear an orange...

14    A    Correct.

15    Q    In this case, when you claim that you saw shoplifting,

16    you did not call the police, correct?

17    A    Correct.

18    Q    Is that because that's a store policy?

19    A    It's not a store policy.  It's like if we see

20    something, we address it.

21    Q    Well, you told the ladies and gentlemen of the jury

22    that you saw a handle of a gun.

23    A    Yes, sir.

24    Q    Right?

25    A    Yes, sir.

*What is Home depots policy on Reporting theft?*

*M years employed?*
*No malice?*

1yc