Patesh - People - Direct

1      Q    Would you not agree with me that addressing it might be

2    to call the police?

3      A    Yeah, but I'm trying to walk away because I'm very

4    scared.

5      Q    Fair enough.  Absolutely.  Fair enough.  So then when

6    you get out of sight from the individual who you claim had a gun,

7    did you call the police?

8      A    I did not.  I called security.

9      Q    You called --

10     A    We have to follow procedure.

11     Q    Okay.  Well, that's what I asked you.  So is there a

12   procedure in place if you see somebody with a gun in the store,

13   specifically?  I mean that's a specific instance, but I'm asking

14   you that.  Is there a particular procedure in place for that?

15     A    Yes.

16     Q    And that if you see somebody with a gun in the store

17   shoplifting, the procedure you're telling the members of the jury

18   is to call Asset Protection?

19     A    Yes.

20     Q    Okay.  Not to call the police?

21     A    Correct.

22     Q    So if you call the police, in your mind, you would have

23   gotten in trouble for that?

24                 MR. MISOREK:  Objection.

25                 THE COURT:  Sustained.

Patesh – People – Direct

1    Call the police immediately.  Did you do that?

2         A    No, sir.

3         Q    Okay.  In your mind though, the person with the gun in

4    the camouflage jacket was going to leave the store, right because

5    I think you said that you saw that person walking out of the

6    aisle, right?

7         A    Yes, sir.

8         Q    And did you -- did you try to call anybody or alert

9    anybody else, like the person who guards the door or who the tape

10   will show opened the door for the gentleman in the camouflage

11   jacket in an attempt to not let him leave?

12        A    No, sir.

13        Q    It was your intent though, and correct me if I'm wrong,

14   to ultimately help the police to try to apprehend the person who

15   you said had a gun, right?

16             MR. MISOREK:   Objection as to his intent.

17        Q    Well, you wanted the person caught, the person had a

18   gun, right?

19        A    Correct.

20        Q    According to you, he said something to you about I'll

21   be back, I live near here, right?

22        A    Correct.

23        Q    Okay.  So ultimately you wanted this person caught and

24   arrested, no?

25        A    No.

Patesh - People - Direct

```
 1     Q    No?

 2          THE COURT:  Sustained as to that.

 3     Q    Well, did you aid the police, did you speak to the

 4   police, did you look at security footage?

 5     A    Yes.

 6     Q    Okay.  Well, why did you do that?

 7          MR. MISOREK:  Objection.

 8     Q    For what purpose did you do that?

 9          MR. MISOREK:  Objection.  He's just arguing with

10     him.

11          MR. ROTHBERG:  I will say it in a nicer tone.

12     Q    Sir, why did you look at security footage?

13     A    Because I was following procedures.

14     Q    Who told you to look at security footage?

15     A    Asset Protection.

16     Q    Did you want to speak to the police?

17     A    Yes.

18     Q    Okay.

19     A    It was procedure.

20     Q    Let's assume that they didn't have the procedure, would

21   you have spoken to the police?

22          MR. MISOREK:  Objection.

23          THE COURT:  Sustained.  He was assisting them,

24     Mr. Rothberg.

25     Q    But you yourself never called the police, you never
```

56

Patesh - People - Direct

1    A    Correct.

2    Q    Okay.  What is the name of that employee?

3    A    Nicholas.

4    Q    Nicholas what?  What is Nicholas' last name?

5    A    I forgot.  I can't remember his last name.

6    Q    Does he still work at Home Depot?

7    A    Yes.

8    Q    You observed the footage back in March of 2011 as well,

9    right?

10    A    Yes.

11    Q    So you saw back in 2011, you saw that it was Nicholas

12    who opened the door for the guy in the blue hoody and the guy

13    with the camouflage jacket, right?

14    A    Yes.

15    Q    Did you have a conversation with Nicholas regarding

16    that day?

17    A    No.

18    Q    You never spoke to him?

19    A    No.

20    Q    You did see them walk right out that door and he opened

21    the door for them?

22    A    Right because the contractor door is open.

23    Q    Okay.  But, but, you never asked him did -- did they

24    say anything to you, did you see a gun?  You never had that

25    conversation?

Patesh - People - Direct

1    Q    -- that you testified to had a camouflage jacket?

2    A    Yes.

3    Q    Who is that person?

4    A    That's him right there.

5    Q    That's what you're saying, right?

6    A    Yes.

7    Q    Now, would you agree with me that when you look at the

8    surveillance video you cannot see the face of either individual;

9    is that correct?

10   A    Correct.

11   Q    Correct?

12   A    Correct.

13   Q    By the way, that portion that we spoke about that you

14   talked about, that you saw in March, but somehow got lost and is

15   not on that, the video the jury is going to see in a minute --

16            MR. MISOREK:  Objection as to lost.

17            MR. ROTHBERG:  All right.  I don't know.  What was

18   it?

19            MR. MISOREK:  Ask you him.

20   Q    What, you couldn't download it?  Is it in cyberspace?

21   A    No.

22   Q    Where is it?

23            MR. MISOREK:  Objection.

24            THE COURT:  No.  Please.  You are being

25   argumentative.  Do you understand the question?

*Security w sales clerk?*

1         THE WITNESS:  Yes.  He wants to know where it is

2   at.

3         THE COURT:  Can you answer that?

4         THE WITNESS:  Sure.

5         THE COURT:  Go right ahead.

6   A   Certain spots that the cameras are not working properly

7   so...

8   Q   But you were able to see it back in March of 2011,

9   correct?

10   A   Yes.

11         THE COURT:  You mean you could see it, but you

12   couldn't download it?

13         THE WITNESS:  Correct.

14   Q   Okay.  So if I went to Home Depot now would I be able

15   to see that?

16         MR. MISOREK:  Objection.

17         MR. ROTHBERG:  No.

18         THE COURT:  I'm allowing it.

19   Q   Would I be able to see that if I went to Home Depot

20   now?

21         THE COURT:  Is it still preserved?

22         THE WITNESS:  Yes.

23   Q   Oh, it is?

24   A   I believe so, yes.

25   Q   You believe so?

Patesh - People - Direct

1        second.

2                    THE COURT:  Sure.

3                    (Whereupon, there is a brief pause in the

4        proceedings.)

5        Q    Now, you said that there are security cameras in the

6        store, obviously.  We have some footage, right?

7        A    Yes.

8        Q    Now, you also said that some were dummies?

9        A    Correct.

10       Q    What is the purpose of having dummy cameras?

11       A    Dummy cameras is like you walk into a store and --

12       Q    So you think there are cameras, but they really don't

13       work?

14       A    Correct.

15       Q    Why don't all of them work?  Is that a money-saving

16       thing or --

17       A    It's just to try to put specific cameras in specific

18       areas of the store.

19       Q    Okay.  So as to try and stop people from stealing?

20       A    Correct.

21       Q    What aisle did you say you saw the two men in?  What

22       was the aisle?

23       A    It was in aisle ten.

24       Q    What is aisle ten, plumbing aisle?

25       A    Aisle ten is the plumbing aisle, correct.

Security cameras?

Installation Records

1    A    In the pants.

2    Q    Was it in a holster or just in the pants?

3    A    No, in the pants.

4    Q    Now, is it a fair statement to say that you did not see

5    the entire gun?

6    A    Correct.

7    Q    You saw a handle of a gun?

8    A    Yes, sir.

9    Q    What color was the handle of the gun?

10    A    Black.

11    Q    It looked just like those ones on TV or...

12    A    I only saw the handle.  I cant tell you, you know, what

13    type it is.

14    Q    Right.  So like do you know the difference between, if

15    I asked you, between a revolver and an automatic pistol?

16    A    Yes.

17    Q    You do know?

18    A    Yes.

19    Q    How do you know that?

20    A    There's magazines.  You could read on them.  You see it

21    everyday.

22    Q    Okay.  What magazine?

23    A    The magazines on the -- there's magazine or on the

24    internet.

25    Q    Well, do you read such magazines?

1    what aisles to put the dummies in?

2              MR. MISOREK:   Objection.

3    Q    How many aisles are in the store?

4    A    There are about 45 aisles.

5    Q    Of the 45 aisles can you tell us approximately how many

6    have dummies and how many have real?

7    A    I know of a couple of them that are real and the rest

8    are dummies, yes.

9    Q    Most are dummies?

10   A    Yes.

11   Q    Now, you -- did you tell the police that there was a

12   woman involved with this incident?

13   A    That I seen on camera, yes. *

14   Q    So anything -- is this a fair statement, sir, anything

15   that you told the police regarding a female was not witnessed

16   firsthand by you, but was witnessed by you on the surveillance

17   video?

18   A    Correct. *

19   Q    It is true that you told the police all about a third

20   person, a woman, correct?

21   A    That was seen on camera, yes.  *

22   Q    Right, entering the store, right?

23   A    No.

24   Q    No?

25   A    The lady was not entering the store.  She was outside

The felony
complaint
per jury

1yc

Patesh - People - Direct

1   the store.

2          Q     Okay.  Did you ever tell the police that defendant

3   Shaquanna Leslie also entered the above location and stood by the

4   front door?

5          A     She was at the food cart, at the front of the store.

6          Q     Okay.  My question is specific.

7                THE COURT:  Excuse me.  The food court?

8                THE WITNESS:  The food cart.  It is like a little

9   cart that has hot dogs.

10               THE COURT:  Is that in the store or outside of the

11  store?

12               THE WITNESS:  Outside of the store.

13         Q     Okay.  That's all well and good, but please answer this

14  --

15               MR. MISOREK:  Objection.

16               MR. ROTHBERG:  All right.  I strike that.

17         Q     Please answer this question for me, if you can.  Did

18  you ever tell the police that defendant Shaquanna Leslie also

19  entered the above location and stood by the front door?

20         A     Yes.

21         Q     You told them that?

22         A     Yes.

23         Q     So she did enter the store?

24         A     She did not enter the store.

25         Q     So then why did you tell them that she entered the

*See felony complaint*

*Malice*

Patesh - People - Direct

1   store?

2              MR. MISOREK:  Objection.

3              THE COURT:  He can answer that.  Ask the question

4       one more time.

5       Q    Okay.

6              THE COURT:  Did you ever tell the police --

7              MR. ROTHBERG:  Judge, I got this.  Please, I will

8       be able to do it.

9       Q    You're saying that -- you're saying that she did not

10  enter the store?

11      A    No.

12      Q    But you're saying that you did tell the police that she

13  entered the store?

14      A    No, I did not.

15      Q    All right.  So just one last time.  If you could just

16  do this for me, did you ever tell the police that Shaquanna

17  Leslie also entered the above location and stood by the front

18  door?

19      A    No.

20      Q    You didn't tell them that?

21      A    No.

22      Q    But you did tell the police certain things about her,

23  right?  Right?  You talked about a female, correct?

24      A    Correct.

25      Q    What did you say about her?

lyc

1      A      I told that the female was in the car with the other

2    two persons and when they came out, she came outside and stood

3    right by the food cart that was outside.

4      Q      Right.  And then what?  And then anything else?

5      A      And when the two gentlemen came outside, she end up

6    walking back to the car and they drove off.

7      Q      Okay.  But you didn't witness this firsthand, correct?

8    You didn't see any of that, right?

9      A      I saw it on camera, correct.

10     Q      Firsthand, with your own eyes?

11     A      No, sir.

12     Q      While it was happening, did you see any of that?

13     A      No, sir.

14     Q      Okay.  So you were able to look at -- right, I'm going

15   back to that day, March 25th, 2011, you were able to look at that

16   store security, right?

17     A      Yes.

18     Q      And you kind of like pieced it together, right?  Did

19   you?

20     A      No, I didn't piece it together.

21     Q      Well, you're telling us -- you told the police that a

22   woman came with the blue hoody guy and the camouflage jacket, you

23   told that all to the police, right?

24     A      Correct.

25     Q      You don't want to say you pieced it together, but you

(handwritten in left margin): How would you see this? Monitor if you're not security

Patesh - People - Direct

1   told them that she was with them and what she did, correct?

2      A   Yes.

3      Q   And that was nothing that you witnessed with your own

4   eyes while it was happening, correct?

5           MR. MISOREK:  Objection.  Asked and answered.

6           THE COURT:  Sustained.

7      Q   And you were able to tell them that because you saw

8   those things on a video, correct?

9      A   Correct.

10      Q   And those things that you saw on the video on March

11   25th, 2011, we don't have that on this video; is that correct?

12      A   Yes.

13      Q   That this jury is going to see?

14      A   Correct.

15      Q   That's the part that couldn't be downloaded or

16   whatever, right?

17      A   Correct.

18           THE COURT:  Anything further, Mr. Rothberg?

19           MR. ROTHBERG:  Yes.

20      Q   Besides the things about the woman that you saw that we

21   can't see, what else can't we see?

22           In other words, what else were you able to see on the

23   March 25th, '11 footage that we are incapable of seeing today?

24      A   That was the only thing.

25      Q   The only thing?

1          THE COURT:  Welcome back, everybody.

2          THE COURT CLERK:  Sir, you are still under oath to

3     tell the truth, okay?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Mr. Rothberg.

6          MR. ROTHBERG:  Just a couple of questions.

7    CROSS EXAMINATION CONTINUED

8    BY MR. ROTHBERG:

9     Q    I just want to go back for a second.

10         You said that the handle of the gun that you claim you

11    saw for a couple of seconds was black?

12    A    Yes, sir.

13    Q    Did you ever at any time tell the police that the gun

14    that you saw was a silver gun?

15    A    No, I did not.

16    Q    Okay.  One other point and then I'm going to be done

17    for now.

18         Who of the two individuals that you talked about, blue

19    hoody, camouflage jacket, who did you see putting items in their

20    pocket?

21    A    The gentleman in the camouflage jacket.

22    Q    Did you ever see the other individual putting items in

23    his pants or jacket or what have you?

24    A    No.

25    Q    Now, again, sir, you recall speaking to the police in

Patesh - People - Direct

1    this case, right?

2        A    Yes.

3        Q    They asked you what happened and you told them what

4    happened?

5        A    Yes.

6        Q    Incidentally, do you recall specifically the names of

7    any police officers that you spoke to?

8        A    No.

9        Q    Well, if I told you Police Officer Joseph Caserta does

10    that ring a bell to you or no?

11        A    No.

12        Q    Okay.  How many police officers did you speak to in

13    total, do you remember?

14        A    It was a couple of them because when they had made the

15    call, couple officers came.

16        Q    Okay.  But you did speak to police officers and you

17    tried to be as accurate as you could when relaying what happened

18    in the case, right?

19        A    Yes.

20        Q    You never said silver handgun to any police officer,

21    right?

22        A    No, sir.

23        Q    Did you ever --

24            MR. ROTHBERG:  Bear with me one second.

25            (Whereupon, there is a brief pause in the

1      proceedings.)

2      Q    Did you ever tell the police that you saw both of the

3      individuals stuffing items in their pockets?

4      A    No.

5      Q    And did you ever tell the police that once the man in

6      the camouflage jacket said those things that you told us about,

7      then after that, that he, the man in the camouflage jacket and

8      the other individual continued to both stuff items in their

9      pockets?  Did you ever tell that to the police?

10      A    Only the camouflage jacket, that's it.

11      Q    So you never told the police that both individuals were

12      stuffing items in their pockets?

13      A    No.

14                MR. ROTHBERG:  That's all I have for now.  Thank

15      you.

16                THE COURT:  Do you want to play the tape?

17                MR. MISOREK:  Thank you, Judge.

18                THE COURT:  Again.  I'm sorry for the

19      inconvenience if you have to strain your neck, but if

20      there's any juror who cannot see you have to let us know.

21                (Whereupon, People's exhibit 1 in evidence is

22      published to the jury.)

23      REDIRECT EXAMINATION

24      BY MR. MISOREK:

25      Q    Sir, were you able to just see the video now?

PO Caserta - People - Cross

1    right?

2        A    Yes, sir.

3        Q    And then is this a fair statement, after speaking to

4    them and giving them information about this particular case, they

5    drafted a complaint, correct?

6        A    Yes, sir.

7        Q    And that's like an charging instrument, charges,

8    charging Mr. Lowery with a crime, right?

9        A    Yes, sir.

10        Q    And then you read that?  Did you read it in this case?

11        A    Yes, sir.

12        Q    And you read it for it's truth and its accuracy,

13    correct?

14        A    Yes, sir.

15        Q    And then I take it that in this particular case, the

16    first draft you were satisfied with it and you signed it,

17    correct?

18        A    I believe so, sir.

19        Q    Now, the information that you relayed to the

20    prosecutor's office that ultimately goes to complaint that you

21    sign, where do you get that information from?

22        A    I apologize, sir.

23        Q    Do you understand the question?

24        A    No, I do not.

25        Q    Okay.  You told the prosecutor's office certain

PO Caserta - People - Cross

```
 1   information regarding this case, right?

 2      A    Yes, sir.

 3      Q    As a result of that you went over this, they drafted a

 4   complaint, correct?

 5      A    Yes, sir.

 6      Q    Okay.  Where did you get that information from?

 7      A    From witnesses, from the two witnesses at the scene.

 8      Q    And those would be?

 9      A    Partap Palesh and Eric Gonzalez.

10      Q    Now, I want to -- I'm going to concentrate on

11   Mr. Palesh.

12      A    Okay.

13      Q    You remember speaking to him, right?

14      A    Yes, sir.

15      Q    And you interviewed him?

16      A    Yes.  Yes.  He was visibly shaking.

17      Q    I apologize.

18      A    He was visibly upset and shaking, yes.

19      Q    That was my question, but if you want to tell the jury

20   that, you may.

21      A    I thought you asked if I interviewed him.

22      Q    I didn't ask --

23           THE COURT:  Please ask him the question.

24      Q    When you interviewed him you asked him what happened,

25   right?
```

1        A       Yes, sir.

2        Q       He told you what happened, right?

3        A       Yes, sir.

4        Q       Again that was the information that you relayed to the

5    DA's office, right?

6        A       Yes, sir.

7        Q       Now, when you -- when he spoke to you -- I take it that

8    when you spoke to him you asked him how many people were

9    involved, correct?

10       A       Yes, sir.

11       Q       And would it be a fair statement that he said two

12   people were involved?

13       A       He said that there was two males and one female

14   outside.

15       Q       Right, but I'm talking about the two males.  He told

16   you about the two males, right?

17       A       Yes, he did.

18       Q       Did Mr. Palesh tell you that both of the males were

19   stuffing their pockets with merchandize from the aisles?

20       A       Between Mr. Palesh and Mr. Gonzalez, that's what I got.

21       Q       I'm asking you about Palesh now.

22       A       I understand that.  Sir, I'm just basing it on my

23   memory of this.

24               THE COURT:  He's asking you specifically whether

25       Palesh -- did Palesh ever say this to you.

1          THE WITNESS:  Palesh said that Mr. Lowery was the

2     one stuffing the stuff in his pockets.

3     Q     He didn't name Lowery?

4     A     I apologize.  I apologize.

5     Q     Am I correct?

6     A     100 percent.  I apologize.

7     Q     He didn't know Matthew Lowery.

8     A     I apologize for that.  You are 100 percent correct.

9     Q     Thank you for that.  He said both of the males,

10    camouflage blue hoody, both of the males were stuffing their

11    pockets with merchandize, did he tell you that?

12    A     No, sir.  No, sir.

13    Q     Okay.  Did you indeed swear to that fact though that he

14    told you that, that both of the males were stuffing their

15    pockets?

16    A     On the day that I spoke to the District Attorney I

17    informed them what both people said so it might have gotten

18    misconstrued with what I was trying to relay.

19    Q     Again, again, please sir.  I know you're trying and I'm

20    not being combative with you.

21    A     Not at all, sir.

22    Q     Please answer my questions.  Did you swear in a

23    Criminal Court complaint that Palesh told you that both of the

24    males were stuffing their pockets?

25    A     Could I see that, please?  I apologize.

The complaint is shown to the cop

lyc

1   Q    You may.  You may.

2              (Whereupon, there is a brief pause in the

3    proceedings.)

4              THE WITNESS:  Judge, I'm just going to look this

5    over.

6              THE COURT:  Sure go ahead.

7              (Whereupon, there is a brief pause in the

8    proceedings.)

9    A    Yes, sir.  Thank you, sir.

10   Q    Okay.  Is that yes, sir in response to my question or

11   is that yes, sir, what's the next question?

12   A    Mr. Patesh told us that Lowery -- excuse me -- that the

13   gentleman in the camouflage jacket was stuffing things in his

14   pockets.

15   Q    What about the other person?

16   A    That he was the look out.

17   Q    Okay.  So my question to you, if that's what he said,

18   my question to you is, why did you swear in a complaint that he

19   told you that they were both stuffing their pockets?

20   A    Like I said, sir, with all the paperwork and with all

21   the talking to the District Attorneys, the following day, some of

22   the things of what the two complaints -- because it's not just

23   one -- get misconstrued.  If I messed up on that I apologize, but

24   everything I have done --

25   Q    Well, did you mess up on this?  Would you agree with

PO Caserta - People - Cross

1   me, would you agree with this, that you swore, whether you made a

2   mistake or not, that's another issue, but would you agree with me

3   that you swore in a complaint that Palesh told you both of the

4   people were stuffing their pockets?  Would you agree with that?

5       A    Yes, sir.

6       Q    Okay.  Now, you're telling the members of the jury that

7   it was a mistake?

8       A    Absolutely.

9       Q    But you did swear to it on --

10           THE COURT:  Asked and answered.  Asked and

11      answered.

12      Q    -- on May 26th, correct?

13           THE COURT:  Sustained.  Sustained.

14      Q    Okay.  Well, when did you swear to this complaint?

15      A    I'm sorry, sir?

16      Q    When did you swear to the complaint?

17      A    The following day.

18      Q    So on the following day you swore to that fact.  Now,

19  you're telling us now, right, almost two years later that that

20  was a mistake, okay.  When for the first time did you tell

21  somebody that you had made a mistake in an accusatory instrument,

22  the factual portion of an accusatory instrument that charges

23  someone with a very serious crime, when did you tell somebody

24  that you made a mistake?

25      A    Like I said, sir, for me that is not making a mistake.

malice

lyc

PO Caserta - People - Cross

1   That is trying to get all the factual evidence and if I perhaps

2   might have put something in there, I did not do that with any

3   mal-intention or anything like that.

4       Q    I'm not saying you did.  I'm really not saying you did,

5   okay.  But nevertheless, I have a question that you haven't

6   answered yet, and that is, when for the first time did you tell

7   somebody that you made a mistake and swore to something that

8   wasn't true?

9               MR. MISOREK:  Objection as to untrue.

10              THE COURT:  Yeah.  Sustained.

11      Q    Well, that you swore to something that was not

12  accurate?

13              MR. ROTHBERG:  Is that okay, Judge?  I'm not be

14       facetious.

15              THE COURT:  Did you ever read the complaint again

16       and say that this was a mistake?

17              THE WITNESS:  No, sir.

18              THE COURT:  That's what he wants to say.  He said,

19       no.

20      Q    Well, do you have it written down anywhere that -- you

21  know what, withdrawn.

22              Okay.  Did you question Mr. Patesh about a gun.

23      A    He told me there was a gun.

24      Q    He told you there was a gun.  As a matter of fact, he

25  told you the color of the gun that he claims he saw; isn't that

1    correct?

2        A    Yes, sir.  Silver.

3        Q    Silver, right?

4        A    Yes, sir.

5        Q    Thank you.

6                THE COURT:  I will clear this courtroom.  Do you

7    understand me back there?  One more reaction.  I apologize

8    Mr. Rothberg.  Continue.

9        Q    And he told you that on March 25th?

10       A    Yes, sir.

11       Q    Correct?

12       A    (Whereupon, the witness nods head up and down.)

13       Q    By the way, did he tell you whether or not he saw the

14   whole gun or part of a gun?

15       A    He said that he was flashed, it was a gun and that it

16   was a silver gun.

17       Q    Flashed a gun?

18       A    Flashed a gun.

19       Q    He didn't say that he saw a part of it or anything like

20   that?

21       A    No, sir.  Flashed a gun.

22       Q    When for the first time on March 25th, of 11, did you

23   see Mr. Lowery?

24       A    If I could just refer -- I apologize.

25                THE COURT:  What time?

Trial
Transcript
Police office

PO Caserta - People - Direct

trial

```
1    Q    In terms of your partner, who was your partner?

2    A    Officer Isernia.

3    Q    Were you assigned a form of transportation?

4    A    Yes, I was.

5    Q    And can you tell the jury was that a marked or unmarked

6  vehicle?

7    A    Unmarked vehicle.

8    Q    Now, at some point do you respond to that address?

9    A    Yes, we do, sir.

10    Q    And what type of location is that?

11    A    It is a Home Depot.

12    Q    When you respond, without discussing what was being

13  said, did you speak to civilians?

14    A    Yes, we did.

15    Q    Can you just tell the jury what were the names of the

16  civilians you spoke to?

17    A    I had a Partap Palesh and Eric Gonzalez.

18    Q    In terms of other than conversations with them, did you

19  conduct any other investigation while inside that Home Depot?

20    A    Yes, we did.

21    Q    Can you describe what type of information you

22  conducted?

23    A    We conducted an investigation into a robbery of a Home

24  Depot.

25    Q    Other than you utilizing interviews, did you utilize
```

161

PO Caserta - People - Cross

1    11:35, does that mean that's the time when somebody placed a call

2    to 9-1-1?

3         A    That's the time when we receive the radio run.  I look

4    down at my watch and I write down the time.

5         Q    Is that generally about the time somebody calls 9-1-1?

6    I mean you should get the call right away, right?

7                   MR. MISOREK:  Objection.

8                   THE COURT:  I will let you answer.

9         A    If someone calls the police we get the call, yes.

10                  MR. ROTHBERG:  Judge, if I could just have a

11   second to speak to Mr. Lowery.

12                  (Whereupon, there is a brief pause in the

13   proceedings.)

14        Q    Did Mr. Palesh tell you that he was a security officer?

15        A    He said he was in part of the loss prevention.

16        Q    I don't know what that means.  Did he tell you he was a

17   security officer?

18        A    The loss prevention officer.

19        Q    You did swear to the fact that he told you he was a

20   security officer, right?

21        A    It's a loss prevention officer at Home Depot.  They are

22   called loss prevention officer.

23        Q    That's what he told you.  What is a loss --

24        A    Loss prevention is kind of like security of a place,

25   but it's labeled as loss prevention.

lyc

PO Caserta - People - Cross/Redirect

1    Q   He didn't tell you he was just a clerk?

2    A   No.

3            MR. ROTHBERG:  That's all I have.

4   REDIRECT EXAMINATION

5   BY MR. MISOREK:

6    Q   Just to be clear, do you remember Mr. Rothberg asking

7   questions about the radio communications you received?

8    A   Yes, sir.

9    Q   Do you actually, over your radio, hear the 9-1-1

10  caller?

11   A   No, we do not.

12   Q   Who do you hear?

13   A   We hear cental, which is dispatch.

14   Q   That's a New York City Police Department dispatcher?

15   A   Yes, sir.

16   Q   You remember Mr. Rothberg asking you a number of

17  questions involving the Criminal Court complaint, yes?

18   A   Yes, sir.

19   Q   The statement you discussed, during the fingerprinting,

20  did you include that in your Criminal Court complaint?

21   A   Yes, sir.

22   Q   Were you informed, without discussing what the

23  statements were, were you informed of any other statements?

24   A   Yes, sir.

25   Q   Who informed you, again without discussing them, who

Complaint# 2011-103-02178

Page 2 of 3

*ERIC never comes to trial* *But say they Robbed us.*

| | |
|---|---|
| Date Of Birth: UNKNOWN | Will View Photo: YES |
| Disabled? NO | Will Prosecute: YES |
| Need Interpreter: | Notified Of Crime Victim Comp. Law: NO |
| Language: | |
| N.Y.C.H.A Resident? | |

**LOCATION ADDRESS** CITY STATE/COUNTRY ZIP APT/ROOM
BUSINESS 92-30 168 STREET QUEENS NEW YORK

Phone #:

Action against Victim:

Actions Of Victim Prior To Incident: UNK.

Victim Of Similar Incident: NO

If Yes, When And Where

### WITNESS : # 1 of 2

Name: **GONZALEZ,ERIC**

Complaint #: **2011-103-02378**

Nick/AKA/Maiden:

Sex/Type: MALE

Race: WHITE HISPANIC

Age:

Date Of Birth:

Need Interpreter: NO

Language:

Gang Affiliation: NO

Name:

Identifiers:

Relationship To Victim: EMPLOYEE

Location    Address    City    State/Country Zip    Apt/Room
HOME-PERMANENT

Phone #: CELL:

### WITNESS : # 2 of 2

Name: **PALESH,PARLAP**

Complaint #: **2011-103-02378**

Nick/AKA/Maiden:

Sex/Type: MALE

Race: ASIAN/PACJS

Age:

Date Of Birth:

Need Interpreter: NO

Language:

Gang Affiliation: NO

Name:

Identifiers:

Relationship To Victim: EMPLOYEE

Location    Address    City    State/Country Zip    Apt/Room
HOME-PERMANENT

Phone #: CELL: 3

### ARRESTS:

Complaint # 2011-103-02378

| Arrest ID | Status | Defendant Name | Sex | Race | AGE | Arrest Date |
|---|---|---|---|---|---|---|
| Q11617604 | ACTIVE | LESLIE, SHAQUANNA | FEMALE | BLACK | 22 | 03/25/2011 |
| Q11617605 | ACTIVE | TAYLOR, DANIEL | MALE | BLACK | 42 | 03/25/2011 |
| Q11617643 | ACTIVE | LOWERY, MATTHEW | MALE | BLACK | 41 | 03/25/2011 |

### PROPERTY:

Complaint #2011-103-02378

Lost/Stolen/Found: STOLEN

Business/Personal/Both?: BUSINESS

Owner Identification Num: NONE

| Item | Amt | Article Description | | Serial # | $ Stolen | $ Recovered |
|---|---|---|---|---|---|---|
| 1. | 6. | PLUMBING EQUIPMENT (BASIN DRAIN) | | | 262. | 0. |

# T L Services Investigations, L.L.C.

Thomas J. LoFrese, P.I.
John G. Whittall
Investigations, Accident Reconstruction

Ed Muccini, Esq.
44-37 Douglaston Parkway
Douglaston, NY 11363

**RE:  People vs. Daniel Taylor**

## Report                                    June 7, 2011

**INSTRUCTIONS: Full investigation into the circumstances of this case.**

## INVESTIGATION:

The file was reviewed and our agent, Kathleen Abitabile, went to the Home Depot 92-30 168th Street, Jamaica, NY.  Please note that Kathleen is a retired Detective Specialist from the NYPD and retired from Gang Intelligence in 2006. She has been working with us in investigations since her retirement. She talked with the store manager and tried to get Eric Gonzalez's schedule and related information. The next day she visited the assistant manager of the store, Evan Clark.  She took photos inside the store of the areas involved and to show that there was a video system in place.  She verified that it was in place at the time of the alleged incident.  A subpoena was prepared for Home Depot to obtain a copy of the video surveillance.  Our agent returned to the store and Evan Clark, asst. store manager, accepted service and advised that he would give it to A. Marique the director of loss prevention.

It was difficult to make arrangements to meet with Eric Gonzalez, because A. Marique was on vacation and was the only person who could give information on Mr. Gonzalez. Home Depot assigned the case to Penny Glass, the regional manger of loss prevention. Numerous calls were made to Ms. Glass on this matter.




Penny Glass finally called and told us that Eric Gonzalez told her he did not see any men with guns. The following day our agent finally met with Eric Gonzalez and he said that the sales assistant, Patefh Roger Partap, who had been with the company six years, saw the whole incident. Our agent talked with Mr. Partap and he stated to our agent that he thought he saw two men shoplifting or acting suspiciously so he walked up the aisle in plumbing. He approached Matthew Lowery and said I saw you take that pipe. Matthew Lowery turned around and opened his jacket and showed him a gun. Lowery was wearing camouflage and also said, "I live around here so make like you never saw anything or I'll be back to get you." Patef then said that the man in the blue jacket was innocent and have never shown a gun or threatened him. He felt that by the expression on Taylor's face he was unaware that Lowery was engaging in anything criminal at that time.

Our agent was given a video, which we reviewed. The video only shows Lowery and Taylor entering the store. In the video Taylor is next to Lowery, but as they proceed up the aisle he walks much faster that Lowery, who is pushing a cart, and walks well ahead. There was no video in the plumbing aisle. From what can be seen in the video it backs up what Mr. Taylor claims happened Mr. Partap would make an excellent witness for the defense of Mr. Taylor.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK,

                    Plaintiff,               **AFFIDAVIT**

     -against-                    CASE 2011QN016528

DANIEL TAYLOR,

                    Defendant.

------------------------------------------------------------------X

I, KATHLEEN ABITABILE being duly sworn hereby state that I am 47 years old and reside in the County of Nassau and employed by TL Services Investigations LLC and that I had been assigned to assist on the investigation into the case People of the State of New York vs. Daniel Taylor. I am a retired from the New York City Police Department and have been working with TL Services Investigations LLC since my retirement.

In the course of this investigation I was required to interview Patefh Roger Partap, who was born April 12, 1976 and resides at 90-07 186th Street, Jamaica, NY having phone number 347-845-3663. I found him to be a creditable witness. He stated that he has been in this country since 1991 from Trinidad and has been employed by the Jamaica, NY Home Depot for six years. His manager had provided me with the contact information about him and stated that he was a reliable employee.

During my interview with him I asked for him to describe the events that took place at the Home Depot on March 25, 2011 in the plumbing aisle involving Matthew Lowery and Daniel Taylor. He freely stated to me that he thought he saw two men shoplifting or acting suspiciously so he walked up the aisle in plumbing. He approached Matthew Lowery and said I saw you take that pipe. Matthew Lowery turned around and opened his jacket and showed him a gun. Lowery was wearing camouflage and also said, "I live around here so make like you never saw anything or I'll be back to get you." Patef then said that the man in the blue jacket was innocent and have never shown a gun or threatened him. He felt that by the expression on Taylor's face he was unaware that Lowery was engaging in anything criminal at that time. He also said that the Eric Gonzalez supplied the police with all information. because he is in loss prevention and it is Home Depot's policy for him to provide all information to the police.

Kathleen Abitabile, being first duly sworn on oath according to law, deposes and says that she has read the foregoing AFFIDAVIT subscribed, that the matters stated herin are true to best of her information and knowledge and belief.

*Kathleen Abitabile*

Kathleen Abitabile

Subscribed and Sworn to before me this 13th day of June, 2011

THOMAS JOHN LoFRESE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01LO4671512
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES FEB. 28, 2015

*Total fabrication "no proof, not even "sell"*

Q11617651

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR, COUNTY OF QUEENS

THE PEOPLE OF THE STATE OF  STATE OF NEW YORK
COUNTY OF QUEENS

                    v.

MATTHEW LOWERY
            DEFENDANT

*Case DISMISSED NOV*

POLICE OFFICER JOSEPH CASERTA OF 103RD PRECINCT, TAX REG#: 943059,
BEING DULY SWORN, DEPOSES AND SAYS THAT ON OR ABOUT MARCH 25 2011  AT
ABOUT 1:15PM, AT THE INTERSECTION OF 107 AVENUE AND 160 STREET, COUNTY
OF QUEENS, STATE OF NEW YORK

THE DEFENDANT COMMITTED THE OFFENSES OF:
PL 110/125.25-1 ATTEMPTED MURDER IN THE SECOND DEGREE
PL 120.10-1 ASSAULT IN THE FIRST DEGREE
PL 265.02-1 CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE

IN THAT THE DEFENDANT DID:  WITH INTENT TO COMMIT THE CRIME OF MURDER
IN THE SECOND DEGREE AND TO CAUSE THE DEATH OF ANOTHER PERSON, ENGAGE
IN CONDUCT WHICH ATTEMPTED TO CAUSE THE DEATH OF SUCH PERSON OR A THIRD
PERSON;WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO ANOTHER PERSON,
CAUSE SUCH INJURY TO SUCH PERSON OR A THIRD PERSON BY MEANS OF A DEADLY
WEAPON OR DANGEROUS INSTRUMENT;COMMIT THE CRIME OF CRIMINAL POSSESSION
OF A WEAPON IN THE FOURTH DEGREE AS DEFINED IN SUBDIVISION ONE, TWO,
THREE OR FIVE OF SECTION 265.01 OF THE PENAL LAW AND WAS PREVIOUSLY
CONVICTED OF ANOTHER CRIME

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S
BELIEF ARE AS FOLLOWS:

DEPONENT STATES THAT AT THE ABOVE MENTIONED DATE, TIME, AND PLACE OF
OCCURRENCE, HE RESPONDED TO A RADIO RUN OF A STABBING AND THAT THE
CALLER WAS IN A CHEVY BLAZER.

DEPONENT FURTHER STATES THAT UPON UPON ARRIVING TO THE ABOVE MENTIONED
LOCATION, HE OBSERVED A TWO-TONE CHEVY BLAZER PARKED AT 107 AVENUE AND
160 STREET IN QUEENS COUNTY, AND FURTHER STATES THAT HE OBSERVED THE
COMPLAINANT, DANIEL TAYLOR AND APPREHENDED OTHER, SHAQUANA LESLIE
(ARREST #Q11617604) EXIT SAID VEHICLE.

DEPONENT FURTHER STATES THAT HE OBSERVED A PUNCTURE WOUND ON THE
COMPLAINANT'S FACE, AS WELL AS BLEEDING ON THE COMPLAINANT'S FACE.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT HE WAS THE PERSON
WHO CALLED 911 ABOUT BEING STABBED AND THAT THE DEFENDANT, MATTHEW
LOWERY, CUT HIM.

*Case Dismissed*

LOWERY,MATTHEW  Q11617651

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE DEFENDANT REPEATEDLY STABBED THE COMPLAINANT WITH AN ICE PICK AFTER THEY FOUGHT OVER A HOME DEPOT STORE CREDIT FOR STOLEN MERCHANDISE.

DEPONENT FURTHER STATES THAT HE OBSERVED SEVERAL PUNCTURE AND OPEN STAB WOUNDS ABOUT THE COMPLAINANT'S SHOULDER, ARMS, STOMACH AND CHEST, AND FURTHER STATES THAT THE COMPLAINANT WAS BLEEDING FROM SAID INJURIES.

DEPONENT FURTHER STATES THAT THE COMPLAINANT BEGAN TO HAVE TROUBLE BREATHING NORMALLY, AND BECAME FAINT.

DEPONENT FURTHER STATES THAT HE TRANSPORTED THE COMPLAINANT TO A LOCAL AREA HOSPITAL TO TREAT SAID INJURIES.

DEPONENT IS FURTHER INFORMED BY DR. SMALLS OF A LOCAL AREA HOSPITAL THAT THE COMPLAINANT NEEDED SEVERAL STITCHES TO CLOSE SAID STAB AND PUNCTURE WOUNDS, AND THAT THE COMPLAINANT ALSO SUSTAINED A COLLAPSED LUNG (PNEUMOTHORAX).

DEPONENT FURTHER STATES THAT HE OBSERVED SAID DOCTOR INSERT TUBING INTO THE COMPLAINANT'S LUNG AND DRAIN BLOOD OUT OF THE COMPLAINANT'S LUNG.

DEPONENT FURTHER STATES THAT THE COMPLAINANT WAS ADMITTED INTO SAID HOSPITAL FOR FURTHER TREATMENT.

DEPONENT FURTHER STATES THAT THE DEFENDANT ADMITTED IN SUM AND SUBSTANCE THAT HE AND THE COMPLAINANT GOT INTO A FIGHT AND THAT HE STABBED HIM.

DEPONENT FURTHER STATES THAT HE HAS EXAMINED AND REVIEWED A COPY OF THE DEFENDANT'S CRIMINAL RECORDS AS MAINTAINED BY THE NEW YORK STATE DEPARTMENT OF CRIMINAL JUSTICE SERVICES, THAT SAID RECORDS WERE MADE IN THE REGULAR COURSE OF SAID BUSINESS AND THAT IT WAS THE REGULAR COURSE OF SUCH BUSINESS TO MAKE IT AT THE TIME OF THE ACT TRANSACTION, OCCURRENCE OR EVENT, OR WITHIN A REASONABLE TIME THEREAFTER, AND THAT SAID RECORDS INDICATE THAT THE DEFENDANT WAS CONVICTED OF PENAL LAW SECTION 120.00-1 ASSAULT IN THE THIRD DEGREE ON DECEMBER 15, 2009 UNDER DOCKET NUMBER 2009QN054399 IN QUEENS COUNTY.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW

3/26/11   PC
DATE      SIGNATURE

SWORN TO BEFORE ME ON THE DAY OF

DATE      SIGNATURE









R obbery

011617604,011617643,011617605

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR, COUNTY OF QUEENS

THE PEOPLE OF THE STATE OF NEW YORK

v.

SHAQUANNA LESLEE
MATTHEW LOWERY
DANIEL TAYLOR
                          DEFENDANTS

2011QN016527

STATE OF NEW YORK
COUNTY OF QUEENS

IND. NO 843/2011

POLICE OFFICER JOSEPH CASERTA OF 103RD PRECINCT, TAX REG#: 943059,
BEING DULY SWORN, DEPOSES AND SAYS THAT ON OR ABOUT MARCH 25 2011 AT
ABOUT 11:20AM, INSIDE OF 92-30 168 STREET, COUNTY OF QUEENS, STATE OF
NEW YORK

THE DEFENDANTS COMMITTED THE OFFENSES OF:
PL 160.15-4 ROBBERY IN THE FIRST DEGREE - AN ARMED FELONY OFFENSE
PL 265.01-2 CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE

IN THAT THE DEFENDANTS, ACTING IN CONCERT, DID: FORCIBLY STEAL
PROPERTY AND IN THE COURSE OF COMMITTING THE CRIME OR OF IMMEDATE
FLIGHT THEREFROM, HE OR ANOTHER PARTICIPANT IN THE CRIME DID DISPLAY
WHAT APPEARED TO BE A PISTOL, REVOLVER, RIFLE, SHOTGUN, MACHINE GUN OR
OTHER FIREARM; POSSESS A DAGGER, DANGEROUS KNIFE, DIRK, RAZOR, STILETTO,
IMITATION PISTOL, SHIRKEN OF KUNG FU STAR OR ANOTHER DANGEROUS OR
DEADLY INSTRUMENT OR WEAPON WITH INTENT TO USE THE SAME UNLAWFULLY
AGAINST ANOTHER PERSON

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S
BELIEF ARE AS FOLLOWS:

DEPONENT STATES THAT HE IS INFORMED BY ERIC GONZALEZ, STORE SECURITY FOR
HOME DEPOT, THAT ON THE ABOVE STATED DATE, TIME, AND LOCATION OF
OCCURRENCE, HE OBSERVED A DARK, TWO-TONE CHEVY BLAZER PULL UP TO THE
ABOVE MENTIONED LOCATION OF OCCURRENCE.

DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT, PARLAP PALESH,
WHO IS A SECURITY OFFICER AT THE ABOVE STATED LOCATION, THAT
DEFENDANT, DANIEL TAYLOR, ENTERED THE LOCATION WITH ANOTHER MALE BLACK.
DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT THAT DEFENDANT
SHAQUANNA LESLIE ALSO ENTERED THE ABOVE LOCATION AND STOOD BY THE
FRONT DOOR.

DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT THAT HE
OBSERVED DEFENDANT TAYLOR AND THE ABOVE MENTIONED OTHER MALE BLACK
STUFFING ITEMS IN THEIR POCKETS AND WHEN THE COMPLAINANT APPROACHED
THEM, THE MALE WITH DEFENDANT TAYLOR LIFTED HIS SHIRT, DISPLAYED THE
HANDLE OF WHAT APPEARED TO BE A FIREARM, AND STATED IN SUM AND

From:

Robbery



LESLIE,SHA-QHANA 011617604, LOWERY,MATTHEW 011617643
TAYLOR,DANIEL 011617605

SUBSTANCE, DON'T MAKE THIS MROE THAN IT HAS TO BE, I LIVE CLOSE BY AND
I'LL COME BACK FOR YOU, AND HE AND DEFENDANT TAYLOR CONTINUED TO STUFF
ITEMS IN THEIR POCKETS AND THEN LEFT SAID LOCATION WITH DEFENDANT
LESLIE, WHO DROVE ALL THREE AWAY IN THE BLAZER

DEPONENT STATES THAT HE RECEIVED A RADIO RUN FOR A STABBING IN A CHEVY
BLAZER SHORTLY AFTER THE CALL FOR THE ABOVE INCIDENT. DEPONENT STATES
THAT HE OBSERVED SAID CHEVY BLAZER PARKED AT 107 AVENUE AND 160 STREET
IN QUEENS COUNTY, AND THAT HE OBSERVED DEFENDANTS TAYLOR AND LESLIE EXIT
SAID VEHICLE. DEPONENT STATES THAT HE OBSERVED A PUNCTURE WOUND ON
DEFENDANT TAYLOR'S FACE. DEPONENT STATES THAT DEFENDANT TAYLOR ADMITTED
THAT HE WAS THE PERSON WHO CALLED 911 ABOUT BEING STABBED AND ADMITTED
THAT HIS FRIEND, DEFENDANT MATTHEW LOWERY, MIGHT'VE CUT HIM, THAT HE AND
DEFENDANTS LESLIE AND LOWERY WERE AT HOME DEPOT EARLIER AND SOME DUMB
SHIT HAPPENED, AND THAT HE OBSERVED DEFENDANT LOWERY ROBBING THE
HOME DEPOT, AND THEN THEY ALL LEFT AND RETURNED THE STUFF AT A DIFFERENT
HOME DEPOT. DEPONENT STATES THAT DEFENDANT TAYLOR ALSO ADMITTED THAT
DEFENDANT LOWERY STABBED HIM WITH AN ICE PICK AFTER THEY FOUGHT OVER THE
HOME DEPOT STORE CREDIT FOR THE STOLEN ITEMS THEY RETURNED.

DEPONENT STATES THAT HE IS INFORMED BY POLICE OFFICER LODICO, TAX NUMBER
939863, THAT HE STOPPED DEFENDANT LOWERY AT 122 AVENUE AND LAKEVIEW
DRIVE, AND THAT DEFENDANT LOWERY ADMITTED IN SUM AND SUBSTANCE THAT
DEFENDANTS LESLIE AND TAYLOR CALLED HIM TO GO DO THE ROBBERY, THAT ALL
THREE DEFENDANTS WANTED TO STEAL STUFF BECAUSE THEY ARE DRUG ADDICTS AND
NEEDED THE MONEY TO BUY DRUGS.

DEPONENT STATES THAT DEFENDANT LOWERY ADMITTED TO HIM IN SUM AND
SUBSTANCE THAT HE AND DEFENDANT TAYLOR GOT INTO A FIGHT AND HE MAY
HAVE STABBED DEFENDANT TAYLOR.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE
PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT
TO SECTION 210.45 OF THE PENAL LAW

3/26/11       PO
DATE       SIGNATURE

SWORN TO BEFORE ME ON THE
.DAY OF

DATE       SIGNATURE

I N D I C T M E N T

S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K

C O U N T Y   O F   Q U E E N S

-------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

XJ.    MATTHEW LOWERY - AFO,VFO
         DEFENDANT
            2011QN016527
              NYSID# 05739260Y

XJ.    DANIEL TAYLOR - AFO,VFO
         DEFENDANT
            2011QN016528
              NYSID# 05438917H

FILED:
INDICTMENT NO. 845/2011

-------------------------------------------------

160.15-4

ROBBERY IN THE FIRST DEGREE (1)

△ 5. 25

our lowyers
407-292-9457

(LOWERY,MATTHEW)
(TAYLOR,DANIEL)

RUE BILL

-------------------

EMAN

DISTRICT ATTORNEY

## FIRST COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSE THE DEFENDANTS OF THE CRIME OF ROBBERY IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, EACH AIDING THE OTHER, ON OR ABOUT MARCH 25, 2011, IN THE COUNTY OF QUEENS, FORCIBLY STOLE CERTAIN PROPERTY, TO WIT: STORE MERCHANDISE FROM PARLAP PALESH FOR HOME-DEPOT, AND IN THE COURSE OF THE COMMISSION OF THE CRIME OR IN IMMEDIATE FLIGHT THEREFROM, THEY DISPLAYED WHAT APPEARED TO BE A PISTOL.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

RICHARD A. BROWN
DISTRICT ATTORNEY