USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/7/13

United States District Court
Southern District of New York       X
Matthew Lowery

            -Plaintiff

      -Vs-

Home Depot USA, 168th Street, Jamaica, NY;
Partap Patesh employee of Home Depot USA;
Eric Gonzalez, employee of Home Depot USA;
Joseph Caserta, New York City Police Officer,
103rd precinct. Jointly or Severally
in their Individual and Official capacities

           -Defendants       X

**Amended Complaint**
**42 U.S.C. § 1983**
(prisoner complaint)

Jury Trial: yes

13-CV-3957 (JPO)

## 1) Statement of Jurisdiction

This Action is a Civil Action seeking relief and/or Damages to defend and protect the Rights

guaranteed by the Constitution of the United States. This Action is brought Pursuant to 42 U.S.C.

1983. This Court has Jurisdiction over this Action Pursuant to 28 U.S.C. 1331; 1343 (3) and (4),

and 2201.

## 2) Parties to this Action

Plaintiff: Matthew Lowery, DIN# 13-A-1581
Address: Great Meadow Correctional Facility
          11739 State Route 22, Box 51
          Comstock, NY 12821-0051.

Defendant: HOME DEPOT U.S.A.
Official Position: Corporate entity, Home Depot U.S.A.,
Employment Address: Home Depot USA, 92-30 168 street, Jamaica, NY 11433
This Defendant is Being sued in His Individual and Official capacities.

Defendant: Partap Patesh
Official Position: Sales associate, Home Depot U.S.A.,
Employment Address: Home Depot USA, 92-30 168 street, Jamaica, NY 11433
This Defendant is Being sued in His Individual and Official capacities.


Defendant: Erick Gonzalez
Official Position: Loss Prevention, Home Depot U.S.A.
Employment Address: Home Depot USA, 92-30 168 street, Jamaica, NY 11433

This Defendant is being sued in His Individual and Official capacities


Defendant: Joseph Caserta
Official Position: Police Officer, New York City Police Department, 103rd Precinct
Employment Address: 103rd Precinct, 168 – 02 91st Avenue, Jamaica, NY 11432

This Defendant is being sued in His Individual and Official capacities


### 3) Previous Lawsuits In State and Federal Courts

A) Have you begun any Other Lawsuits In State or Federal Court dealing with the same facts involved in this Action?    **No.**


B) Have you begun any other Lawsuits in Federal Court, which relate to your imprisonment?
One (1) Listed Below. [If more than one previous lawsuit, list the same points as below, as to each lawsuit]


1) Name[s] of the Parties to this Other Lawsuit: LOWERY V. JOHN A.M.K.C. DOE, et al.,

Plaintiff[s]: Matthew Lowery

Defendant[s]: Luis Rivera, Lindo

2) District Court: U.S. District Court, Southern District of New York

3) Docket Number: 13-Civ-2879 (RA)

4) Name of District or Magistrate Judge to whom case was assigned: Ronnie Abrams, U.S.

District Judge, Southern District of New York.

5) The Approximate Date the Action was Filed: April 23, 2013

6) What was the disposition of the Case?  Pending.

### FIRST CLAIM

Defendants Home Depot U.S.A. a corporate entity, it's employees
Partap Patesh, and Erick Gonzalez shared a common Goal with
New York City Police officer Joseph Caserta of the 103rd precinct
To Fabricate and manufacture Evidence to Deprive Plaintiff Matthew
Lowery of His substantive due Process rights by arresting Plaintiff without
Probable cause On False robbery charges Convicting Plaintiff Lowery on
fabricated and Manufactured Evidence. See *U.S.C.A. Const. Amend. IV; XIV*;
*Adickes V. S.H. Kress & Co.*, 398 U.S. 144, 150 91970);*Bang V. Utopia
Restaurant*, 923 F. Supp 46 (E.D.N.Y. 1996); *Murray V. Walmart, Inc.*,
874 F.2d 555 (8th Cir 1989)

### Facts

1 ) On March 25th, 2011 NYPD Police Officer  Joseph Caserta (P.O. Caserta), responded

to a 911 call by Shaquanna Leslie (Leslie) regarding an assault which was alleged to have

happened earlier that day to Her boyfriend Daniel Taylor (Taylor). An alleged assault in which

Mr. Taylor did not sustain any Physical injuries, no injuries were visible. See  Ex. A, Complaint

form

3

2) While responding to this 911 call P.O. Caserta began to question Taylor and Ms. Leslie As to the alleged assault incident. P.O. Caserta noticed no visible injuries to Taylor. P.O. Caserta then questioned Taylor as to His relationship with Matthew Lowery (Plaintiff) as P.O. Caserta had seen Taylor with the Plaintiff on past occasions in the neighborhood of Jamaica, in Queens County New York. P.O. Caserta then stated He would investigate the Matter and left.

3) Earlier that day On March 25th, 2011 at Approximately Plaintiff Lowery entered a Home Depot USA (Home Depot) at 168 street, Jamaica, Queens, within the state of New York for the purpose of purchasing a drain trap, which are sold inside of Home Depot. Plaintiff was accompanied by a Ms. Leslie , and Taylor. Plaintiff's line of work was in the Construction field by trade. See Ex. B, Felony Complaint #2, Exhibit C, Indictment, Exhibit D, Transcripts.

4) While in the plumbing section of the Home Depot in which inventories of Drain Traps are kept Plaintiff began examining Drain traps in order to determine which trap would be best for purchase.

5) While examining such drain traps, Plaintiff was approached by One Partap Patesh (Patesh) who told the Plaintiff He was store security. Mr. Patesh stated to the Plaintiff while the Plaintiff was examining the Drain traps: " I saw you put that pipe in your pocket, if you let me see the one behind our zipper, I'll let you keep them both." Defendant Patesh did not take proper Home Depot USA Procedures and report the incident to store loss prevention.[1]

---

[1] Defendant Parlesh was actually a sales associate. See ¶ 7. thus the proper procedure if He truly believed Plaintiff committed shoplifting was to contact loss prevention.

6) Patesh grabbed and seized the Plaintiff and called for the actual store security. Plaintiff who was startled by the statement and actions of grabbing Him by Defendant Patesh in which the Plaintiff interpreted as Homosexual and implying criminal theft screamed at Patesh: "get the fuck off of me." actual store security came, Plaintiff was searched no inventory or property was found to be had on the Plaintiff's person. At that time the Plaintiff was not accused of any criminal activity. Plaintiff was escorted out of the store, and left the store without further incident. See Ex. D, Trial Transcripts, Ex. A, Complaint Form.

7) Sometime after the Plaintiff had left the Home Depot, Defendant Patesh who was actually a sales associate reported a shoplifting to Defendant Erick Gonzalez (Gonzalez). There was Video Tape available from the Home Depot area where Plaintiff was at earlier when Defendant Patesh made His Statement in ¶ 5 above. The Video conclusively showed that the Plaintiff did no illegal action. These videos were reviewed for approximately 20 minutes by Defendants Patesh, and Gonzalez. See Ex. E, Affidavit prepared by TLC Services.

8) Defendant Gonzalez without conducting any further investigation as to the shoplifting allegation of Defendant Patesh called 911 to report a shoplifting to the Police. Defendant Patesh also within this same 911 call alleged plaintiff had shoplifted from Home Depot.

9) Sometime Later Defendant NYPD Officer Joseph Caserta ( P.O. Caserta) responding to the above 911 call arrived at Home Depot. Defendant Patesh informed Caserta He was a Security employee at the Home Depot. Defendants Gonzalez, and Patesh then reviewed with P.O. Caserta the video footage of the Home Depot aisle where the Plaintiff was earlier that day.

10) P.O. Caserta viewed the In store video with Home Depot USA , employees Patesh, and Gonzalez. The video showed no criminal activity by the Plaintiff. However Patesh, and

Gonzalez still reported the allegations of a shoplifting to P.O. Caserta. Caserta then after reviewing this video left the store.

11) P.O. Caserta returned back to the residence of Mr. Taylor after reviewing the Video at Home Depot USA. P.O. Caserta notified Taylor and Ms.Leslie that He knew Taylor was with Plaintiff at a Home Depot ealier that day and that He committed a shoplifting with Plaintiff. P.O. Caserta then told Taylor to give up Plaintiff to which Taylor agreed fearing He'd be arrested, fpr shoplifting. Leslie and Taylor informed P.O. Caserta where the Plaintiff was located. P.O. Caserta told Leslie If you tell me where Matthew Lowery is I will let you go.[2] See. Ex. B, Felony Complaint #2

12) P.O. Caserta then returned to the Home Depot to inform Defendants Patesh, and Gonzalez that He had someone who would testify upon the Plaintiff. Defendants P.O. Caserta, Patesh, and Gonzalez together concocted a falsified Robbery charge against the Plainitiff by claiming the Plaintiff displayed a Handgun which would upgrade the falsified shoplifting charge to a falsified Robbery charge. When in fact Video never showed Plaintiff displaying any Handgun, nor committing any shoplifting of store merchandise. The store door security receipt checker after searching the Plaintiff observed the Plaintiff leaving and alleged no shoplifting, nor any Robbery. See Exhibit D, Transcripts

13) Plaintiff Matthew Lowery was 4 hours later arrested while driving His Car with His live- in girlfriend Tonya patterson , and charged in two separate felony complaints by P.O. Caserta with the following crimes on March 26, 2011:

(first felony complaint  Q11617651)

---

[2] Leslie was alleged to be a co-defendant with Plaintiff. she was later exonerated of all charges. No true bill.

i)      attempted murder in the second degree;

ii)     assault in the first degree;

iii)    criminal possession of a weapon in the second degree;

(second felony complaint Q11617604)

i)      Robbery in the first degree – an armed felony;

ii)     Criminal possession of a weapon in the fourth degree.

14) None of the above crimes had sound basis, Defendants P.O. Caserta, Patesh, and Gonzalez concocted fabricated and Manufactured the crimes above against the Plaintiff without evidentiary support. P.O. Caserta persuaded Taylor to lie and say He (Taylor) was physically assaulted by the Plaintiff, when in fact Plaintiff never assaulted Taylor the second felony complaint as to these false allegations were dismissed in Court. See Ex. A, Ex. C, Ex. F All Complaints.

A) **The Constitutional Basis for this first Claim under 42 U.S.C. § 1983 is** Defendants Home Depot U.S.A. a corporate entity, it's employees Partap Patesh, and Erick Gonzalez shared a common Goal with New York City Police officer Joseph Caserta of the 103rd precinct To Fabricate and manufacture Evidence to Deprive Plaintiff Matthew Lowery of His substantive due Process rights by arresting Plaintiff without Probable cause On False robbery charges Convicting Plaintiff Lowery on fabricated and Manufactured Evidence. See U.S.C.A. Const. Amends. IV;  XIV; Adickes V. S.H. Kress & Co., 398 U.S. 144, 150 91970);Bang V. Utopia Restaurant, 923 F. Supp 46 (E.D.N.Y. 1996); Murray V. Walmart, Inc., 874 F.2d 555 (8th Cir 1989)

B) **The Relief I am seeking for this First Claim is:** $500.00 in compensatory and $500.00 Punative damages per day for loss of freedom until resolution of this suit; and $1,000,000.00 per false arrest.

**C) Exhaustion Of Your Administrative Remedies for this Claim:**   no need for exhaustion of administrative remedies, these are not claims in need of exhaustion of administrative remedies.

**Relief Sought**

Plaintiff Seeks In Compensatory and in Punitive Damages for Claims 1 through 3. Totaling Over $ 4, 500,000 in damages

Plaintiff seeks Attorney Fees and Court Costs for Claim# 1

Plaintiff Requests a Trial By Jury.

(Sworn) I do declare under Penalty of Perjury the foregoing is true and correct. 28 U.S.C.§ 1746

Respectfully submitted,

X _____

, Matthew Lowery, DIN# 13A1581

Sworn to before Me this              Great Meadow C.F., Box 51,

_30_ day of _July_ , 2013          Comstock, New York 12821-0051.

_____

Notary Public

Robert H. Moseley
Notary Public, State of New York
Qualified in Washington Co. No. 01MO6270249
My Commision Expires February 11, 20 _17_

**List of Exhibits**

Exhibit A – Complaint

Exhibit B – felony complaint # 2

Exhibit C- Indictment

Exhibit D, Transcripts

Exhibit E- Affidavit prepared by TLC Services.

Exhibit F- felony complaint # 1

Complaint# 2011-103-02378                                      Page 2 of 3

*[handwritten: ERIC Never comes no trial But say they Robbed Us]*

| | |
|---|---|
| Date Of Birth: UNKNOWN | Will View Photo: YES |
| Disabled? NO | Will Prosecute: YES |
| Need Interpreter: | Notified Of Crime Victim Comp. Law: NO |
| Language: | |
| N.Y.C.H.A Resident? | |

| LOCATION ADDRESS | CITY | STATE/COUNTRY ZIP APT/ROOM |
|---|---|---|
| BUSINESS 82-30 168 STREET QUEENS NEW YORK | | |

Phone #:

| Action against Victim: | Actions Of Victim Prior To Incident: UNK. |
|---|---|
| Victim Of Similar Incident: NO | If Yes, When And Where |

## WITNESS : # 1 of 2

| | Name: GONZALEZ,ERIC | Complaint #: 2011-103-02378 |
|---|---|---|

| Nick/AKA/Maiden: | |
|---|---|
| Sex/Type: MALE | Gang Affiliation: NO |
| Race: WHITE HISPANIC | Name: |
| Age: | Identifiers: |
| Date Of Birth: | |
| Need Interpreter: NO | Relationship To Victim: EMPLOYEE |
| Language: | |

| Location | Address | City | State/Country Zip Apt/Room |
|---|---|---|---|
| HOME-PERMANENT | | | |

Phone #: CELL:

## WITNESS : # 2 of 2

| | Name: PALESH,PARLAP | Complaint #: 2011-103-02378 |
|---|---|---|

| Nick/AKA/Maiden: | |
|---|---|
| Sex/Type: MALE | Gang Affiliation: NO |
| Race: ASIAN/PACJI | Name: |
| Age: | Identifiers: |
| Date Of Birth: | |
| Need Interpreter: NO | Relationship To Victim: EMPLOYEE |
| Language: | |

| Location | Address | City | State/Country Zip Apt/Room |
|---|---|---|---|
| HOME-PERMANENT | | | |

Phone #: CELL: 3

## ARRESTS:

Complaint # 2011-103-02378

| Arrest ID | Status | Defendant Name | Sex | Race | AGE | Arrest Date |
|---|---|---|---|---|---|---|
| Q11617604 | ACTIVE | LESLIE, SHAQUANNA | FEMALE | BLACK | 22 | 03/25/2011 |
| Q11617605 | ACTIVE | TAYLOR, DANIEL | MALE | BLACK | 42 | 03/25/2011 |
| Q11617643 | ACTIVE | LOWERY, MATTHEW | MALE | BLACK | 41 | 03/25/2011 |

## PROPERTY:

Complaint #2011-103-02378

| Lost/Stolen/Found: STOLEN | Business/Personal/Both?: BUSINESS | Owner Identification Num: NONE |
|---|---|---|

| Item | Amt | Article Description | Serial # | $ Stolen | $ Recovered |
|---|---|---|---|---|---|
| 1. | 6. | PLUMBING EQUIPMENT (BASIN DRAIN) | | 252. | 0. |

From:

05/06/2011 08:32    #187 P.002/007



Q11617604, Q11617643, Q11617605

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR, COUNTY OF QUEENS

THE PEOPLE OF THE STATE OF NEW YORK                STATE OF NEW YORK
                                                   COUNTY OF QUEENS
                          v.
                   

SHAQUANNA LESLIE
MATTHEW LOWERY
DANIEL TAYLOR
            DEFENDANTS

IND. NO 845/2011

POLICE OFFICER JOSEPH CASERTA OF 103RD PRECINCT, TAX REG#: 943059,
BEING DULY SWORN, DEPOSES AND SAYS. THAT ON OR ABOUT MARCH 25 2011 AT
ABOUT 11:20AM, INSIDE OF 92-30 168 STREET, COUNTY OF QUEENS, STATE OF
NEW YORK

THE DEFENDANTS COMMITTED THE OFFENSES OF:
PL 160.15-4 ROBBERY IN THE FIRST DEGREE - AN ARMED FELONY OFFENSE
PL 265.01-2 CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE

IN THAT THE DEFENDANTS, ACTING IN CONCERT, DID: FORCIBLY STEAL
PROPERTY AND IN THE COURSE OF COMMITTING THE CRIME OR OF IMMEDATE
FLIGHT THEREFROM, HE OR ANOTHER PARTICIPANT IN THE CRIME DID DISPLAY
WHAT APPEARED TO BE A PISTOL, REVOLVER, RIFLE, SHOTGUN, MACHINE GUN OR
OTHER FIREARM; POSSESS A DAGGER, DANGEROUS KNIFE, DIRK, RAZOR, STILETTO,
IMITATION PISTOL, SHIRKEN OF KUNG FU STAR OR ANOTHER DANGEROUS OR
DEADLY INSTRUMENT OR WEAPON WITH INTENT TO USE THE SAME UNLAWFULLY
AGAINST ANOTHER PERSON

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S
BELIEF ARE AS FOLLOWS:

DEPONENT STATES THAT HE IS INFORMED BY ERIC GONZALEZ, STORE SECURITY FOR
HOME DEPOT, THAT ON THE ABOVE STATED DATE, TIME, AND LOCATION OF
OCCURRENCE, HE OBSERVED A DARK, TWO-TONE CHEVY BLAZER PULL UF TO THE
ABOVE MENTIONED LOCATION OF OCCURRENCE.

DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT, PARLAP PALESH,
WHO IS A SECURITY OFFICER AT THE ABOVE STATED LOCATION, THAT
DEFENDANT, DANIEL TAYLOR, ENTERED THE LOCATION WITH ANOTHER MALE BLACK.
DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT THAT DEFENDANT
SHAQUENNA LESLIE ALSO ENTERED THE ABOVE LOCATION AND STOOD BY THE
FRONT DOOR.

DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT THAT HE
OBSERVED DEFENDANT TAYLOR AND THE ABOVE MENTIONED OTHER MALE BLACK
STUFFING ITEMS IN THEIR POCKETS AND WHEN THE COMPLAINANT APPROACHED
THEM, THE MALE WITH DEFENDANT TAYLOR LIFTED HIS SHIRT, DISPLAYED THE
HANDLE OF WHAT APPEARED TO BE A FIREARM, AND STATED IN SUM AND



LESLIE, ED.DUANE, 011517604, LOWERY, MATTHEW  011617641
WAYLOR, DANIEL  013617605

SUBSTANCE, DON'T MAKE THIS MROE THAN IT HAS TO BE, I LIVE CLOSE BY AND I'LL COME BACK FOR YOU, AND HE AND DEFENDANT TAYLOR CONTINUED TO STUFF ITEMS IN THEIR POCKETS AND THEN LEFT SAID LOCATION WITH DEFENDANT LESLIE, WHO DROVE ALL THREE AWAY IN THE BLAZER

DEPONENT STATES THAT HE RECEIVED A RADIO RUN FOR A STABBING IN A CHEVY BLAZER SHORTLY AFTER THE CALL FOR THE ABOVE INCIDENT.  DEPONENT STATES THAT HE OBSERVED SAID CHEVY BLAZER PARKED AT 107 AVENUE AND 160 STREET IN QUEENS COUNTY, AND THAT HE OBSERVED DEFENDANTS TAYLOR AND LESLIE EXIT SAID VEHICLE.  DEPONENT STATES THAT HE OBSERVED A PUNCTURE WOUND ON DEFENDANT TAYLOR'S FACE.  DEPONENT STATES THAT DEFENDANT TAYLOR ADMITTED THAT HIS FRIEND, DEFENDANT MATTHEW LOWERY, MIGHT'VE CUT HIM, THAT HE AND DEFENDANTS LESLIE AND LOWERY WERE AT HOME DEPOT EARLIER AND SOME DUMB SHIT HAPPENED, AND THAT HE OBSERVED DEFENDANT LOWERY ROBBING THE STORE, AND THEN THEY ALL LEFT AND RETURNED THE STUFF AT A DIFFERENT HOME DEPOT.  DEPONENT STATES THAT DEFENDANT TAYLOR ALSO ADMITTED THAT DEFENDANT LOWERY STABBED HIM WITH AN ICE PICK AFTER THEY FOUGHT OVER THE HOME DEPOT STORE CREDIT FOR THE STOLEN ITEMS THEY RETURNED.

DEPONENT STATES THAT HE IS INFORMED BY POLICE OFFICER LODICO, TAX NUMBER 938863, THAT HE STOPPED DEFENDANT LOWERY AT 122 AVENUE AND LAKEVIEW DRIVE, AND THAT DEFENDANT LOWERY ADMITTED IN SUM AND SUBSTANCE THAT DEFENDANTS LESLIE AND TAYLOR CALLED HIM TO GO DO THE ROBBERY, THAT ALL THREE DEFENDANTS WANTED TO STEAL STUFF BECAUSE THEY ARE DRUG ADDICTS AND NEEDED THE MONEY TO BUY DRUGS.

DEPONENT STATES THAT DEFENDANT LOWERY ADMITTED TO HIM IN SUM AND SUBSTANCE THAT HE AND DEFENDANT TAYLOR GOT INTO A FIGHT AND HE MAY HAVE STABBED DEFENDANT TAYLOR.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW

3/26/11        PO
DATE        SIGNATURE

SWORN TO BEFORE ME ON THE
DAY OF

DATE        SIGNATURE

I N D I C T M E N T

S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K

C O U N T Y   O F   Q U E E N S

------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

FILED:
INDICTMENT NO. 845/2011

XJ.    MATTHEW LOWERY - AFO,VFO
       DEFENDANT
          2011QN016527
             NYSID# 05739260Y

XJ.    DANIEL TAYLOR - AFO,VFO
       DEFENDANT
          2011QN016528
             NYSID# 05438917H

------------------------------------------------

160.15-4     ROBBERY IN THE FIRST DEGREE (1)

(LOWERY,MATTHEW)
(TAYLOR,DANIEL)

Δ 5. 25
an howyers
407-292-9457

RUE BILL

------------------------

EMAN                                    DISTRICT ATTORNEY

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSE THE DEFENDANTS OF THE CRIME OF ROBBERY IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, EACH AIDING THE OTHER, ON OR ABOUT MARCH 25, 2011, IN THE COUNTY OF QUEENS, FORCIBLY STOLE CERTAIN PROPERTY, TO WIT: STORE MERCHANDISE FROM PARLAP PALESH FOR HOME-DEPOT, AND IN THE COURSE OF THE COMMISSION OF THE CRIME OR IN IMMEDIATE FLIGHT THEREFROM, THEY DISPLAYED WHAT APPEARED TO BE A PISTOL.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

RICHARD A. BROWN
DISTRICT ATTORNEY

Pre-trial
excerpt
Feb 16th 2012

PO JOSEPH CASERTA - People - Direct

15

Perlap

1    some point at the Home Depot, can you tell the Court what you did?

2        A    At that time when we approached the location, we looked

3    for the complainant — the complainants were in the back of the

4    location.

5        Q    And did you come to find out the names of the

6    complainants?

7        A    Yes, I did.

8        Q    And can you just tell the Court their names?

9        A    Their names was Eric Gonzalez and a Paulette Parlesh.

10       Q    Did you interview one, both, none?

11       A    Both.

12       Q    And just describe for us how the interview went, what did

13   you say; what did they say?

14       A    When we approached the location, we finally found the

15   complainants a, Mr. Eric Gonzalez was in charge of loss prevention

16   there.  He was the one with the videotape, of the surveillance in

17   the area; and Mr. Paul Perlish was the gentleman from loss

18   prevention that approached the two suspects and was shown a firearm

19   at the time.

20       Q    All right.  If you could, specifically with regard to the

21   conversation with Parlesh, describe the conversation as best you

22   can in detail?

23       A    Mr. Parlesh informed me he approached the two suspects at

24   the location and that ████████ was shoving drains down his

25   pants.

PO JOSEPH CASERTA - People - Cross (Muccini)

1    Q    They were in the back seat of the vehicle?

2    A    They were in the back seat.

3    Q    And Mr. Gonzalez actually identified Mr. Taylor?

4    A    Yes, he did.

5    Q    Was it your understanding that Mr. Gonzalez saw the

6    alleged robbery take place in the plumbing aisle?

7    A    My understanding of it was Mr. Parlesh was, the gentleman

8    that was involved, which he was, and Mr. Gonzalez was just in the

9    vehicle at the time of the Parlesh's identification?

10    THE COURT:    He is asking how would Gonzalez know.

11    THE WITNESS:    I understand the question. I understand

12    the question. I just approached the vehicle, they both said

13    that's him, one hundred percent.

14    Q    You didn't ask Mr. Gonzalez how he knew?

15    A    No. Mr. Parlesh, like I said, one hundred percent said

16    it was him. Mr. Gonzalez said it was him.

17    Q    In front of you, all Mr. Parlesh said was that's him, he

18    didn't say anything else?

19    A    One hundred percent, that's him.

20    Q    That's him, okay.

21    THE COURT:    Do you know if Gonzalez saw any of this going

22    down while he was sitting in his office?

23    THE WITNESS:    I do not. We reviewed the tape with him.

24    THE COURT:    You didn't see it?

25    THE WITNESS:    You can't see down the aisle. The camera I

gjn



PO JOSEPH CASERTA - People - Cross (Muccini)

58

1    *Lawyer* Q    Who came and got you?

2    *Cop* A    Mr — excuse me, the cashier brought me to the back.

3    *Lawyer* Q    Okay. And in the back you spoke with two individuals,

4    right?

5    *Cop* A    Yes, sir.

6    *Lawyer* Q    Mr. Parlesh — What's the individual's name you spoke to?

7    *Cop* A    There was two; there was Eric Gonzalez and Paulette

8    Parlesh.

9    *Lawyer* Q    Now, Mr. Parlesh is it?

10    *Cop* A    Yes, sir.

11    *Lawyer* Q    Parlesh, is he one of the individuals at Home Depot that

12    wears the orange apron and walks around the store?

13    →    A    He is a loss prevention person that works there.

14    *Judge →* THE COURT:    What was he wearing the day you spoke to him?

15    *Cop*    THE WITNESS:    I don't remember what he was wearing.

16    *Judge →* THE COURT:    So he is not just a person that works at Home

17    Depot in the aisles helping people out, is he?

18    *Cop*    THE WITNESS:    I don't believe so.

19    *Judge →* THE COURT:    So he actually has a title, loss prevention

20    agent or representative?

21    *Cop*    THE WITNESS:    Employee. I believe so. He is from the

22    loss prevention.

23    *Lawyer* Q    And then this individual Eric Gonzalez, what is his job

24    description, if you know?

25    *Cop* A    I believe he is as well, loss prevention.

*Trial*
*one docx transcript employee*

Mr. Patesh : People – Direct

*Atual Trial*

28

*Acting Beyond scope of employment*

1        call Partap Patesh.

2    P A R T A P   P A T E S H,      a witness called by and on behalf

3    of the People, upon being duly sworn, testified as follows:

4                THE COURT OFFICER: People call Partap Patesh.

5        P-A-R-T-A-P. Last name P-A-T-E-S-H. Resident of Queens

6    County.

7                THE COURT: Good morning, Mr. Patesh.

8                THE WITNESS: Good morning.

9                THE COURT: Sir, I apologize but that microphone

10    is not working.

11                THE WITNESS: Okay.

12                THE COURT: Okay? I'm going to ask you to speak

13    up very, very loud, as loud as you can and direct your

14    responses to the ladies and gentlemen of the jury, okay?

15                THE WITNESS: I will.

16                THE COURT: Mr. Misorek.

17    DIRECT EXAMINATION

18    BY MR. MISOREK:

19        Q    Good morning, sir.

20        A    Good morning.

21        Q    As you sit here today have you ever been convicted of a

22    crime?

23        A    No.

24        Q    I want to take you back to March 25th of 2011, at

25    approximately 11:20 in the morning, inside of 92-30 168th Street.

Patesh - People - Direct

1          THE WITNESS: Aisle 10.

2      A    As I was walking aisle ten, I was helping customers on

3   the way, and I noticed two Africa Americans.  One was facing me,

4   he was wearing a blue hoody and the other guy was wearing a

5   camouflage jacket.  He was just grabbing stuff from the shelf and

6   just put it in his jacket.  He was taking about two or three at a

7   time because he was so big, you know, and his hand was huge.

8   Just grabbing items up in his jacket.  So I kindly went up to him

9   and I said, excuse me, sir, can you do me a favor, can you please

10  put back the items that you took back on the shelf.  He was like,

11  no.  He was like are you a police.  I was like no, I'm not.  I'm

12  just a regular associate.  He was like, oh, well, he lives right

13  around the corner, if he has any problem -- if I have any

14  problem, he will come back for me at any time.  At the same time

15  when he told me that, he move his jacket to the side.

16          THE COURT:  Indicating the left side of the

17      jacket, moving backward.

18          THE WITNESS:  Correct.

19      A    And I saw the handle of a gun that was in his back.  So

20  you know, I step back as I turn around.  When I turn away, I was

21  going back, we have some vanity mirrors, you know, we had a set

22  that we had on top.  So I was walking back, I'm looking at the

23  mirror because I was scared.  You know what I'm saying?  There's

24  a gun, you know, I can't protect myself or anything.  So I'm

25  looking back to make sure that they don't come after me or

*against store policy (diligence?)*

Patesh - People - Direct

1    Q    Would you not agree with me that addressing it might be

2    to call the police?

3    A    Yeah, but I'm trying to walk away because I'm very

4    scared.

5    Q    Fair enough.  Absolutely.  Fair enough.  So then when

6    you get out of sight from the individual who you claim had a gun,

7    did you call the police?

8    A    I did not.  I called security.

9    Q    You called --

10   A    We have to follow procedure.

11   Q    Okay.  Well, that's what I asked you.  So is there a

12   procedure in place if you see somebody with a gun in the store,

13   specifically?  I mean that's a specific instance, but I'm asking

14   you that.  Is there a particular procedure in place for that?

15   A    Yes.

16   Q    And that if you see somebody with a gun in the store

17   shoplifting, the procedure you're telling the members of the jury

18   is to call Asset Protection?

19   A    Yes.

20   Q    Okay.  Not to call the police?

21   A    Correct.

22   Q    So if you call the police, in your mind, you would have

23   gotten in trouble for that?

24              MR. MISOREK:  Objection.

25              THE COURT:  Sustained.

lyc

59

Patesh - People - Direct

1    Q    -- that you testified to had a camouflage jacket?

2    A    Yes.

3    Q    Who is that person?

4    A    That's him right there.

5    Q    That's what you're saying, right?

6    A    Yes.

7    Q    Now, would you agree with me that when you look at the

8    surveillance video, you cannot see the face of either individual;

9    is that correct?

10   A    Correct.

11   Q    Correct?

12   A    Correct.

13   Q    By the way, that portion that we spoke about that you

14   talked about, that you saw in March, but somehow got lost and is

15   not on that, the video the jury is going to see in a minute --

16              MR. MISOREK:  Objection as to lost.

17              MR. ROTHBERG:  All right.  I don't know.  What was

18   it?

19              MR. MISOREK:  Ask you him.

20   Q    What, you couldn't download it?  Is it in cyberspace?

21   A    No.

22   Q    Where is it?

23              MR. MISOREK:  Objection.

24              THE COURT:  No.  Please.  You are being

25   argumentative.  Do you understand the question?

lyc

PO Caserta - People - Cross

1 right?

2    A    Yes, sir.

3    Q    And then is this a fair statement, after speaking to
4 them and giving them information about this particular case, they
5 drafted a complaint, correct?

6    A    Yes, sir.

7    Q    And that's like an charging instrument, charges,
8 charging Mr. Lowery with a crime, right?

9    A    Yes, sir.

10    Q    And then you read that?  Did you read it in this case?

11    A    Yes, sir.

12    Q    And you read it for it's truth and its accuracy,
13 correct?

14    A    Yes, sir.

15    Q    And then I take it that in this particular case, the
16 first draft you were satisfied with it and you signed it,
17 correct?

18    A    I believe so, sir.

19    Q    Now, the information that you relayed to the
20 prosecutor's office that ultimately goes to complaint that you
21 sign, where do you get that information from?

22    A    I apologize, sir.

23    Q    Do you understand the question?

24    A    No, I do not.

25    Q    Okay.  You told the prosecutor's office certain

PO Caserta - People - Cross

1   information regarding this case, right?

2        A    Yes, sir.

3        Q    As a result of that you went over this, they drafted a

4   complaint, correct?

5        A    Yes, sir.

6        Q    Okay.  Where did you get that information from?

7        A    From witnesses, from the two witnesses at the scene.

8        Q    And those would be?

9        A    Partap Palesh and Eric Gonzalez.

10       Q    Now, I want to -- I'm going to concentrate on

11  Mr. Palesh.

12       A    Okay.

13       Q    You remember speaking to him, right?

14       A    Yes, sir.

15       Q    And you interviewed him?

16       A    Yes.  Yes.  He was visibly shaking.

17       Q    I apologize.

18       A    He was visibly upset and shaking, yes.

19       Q    That was my question, but if you want to tell the jury

20  that, you may.

21       A    I thought you asked if I interviewed him.

22       Q    I didn't ask --

23            THE COURT:  Please ask him the question.

24       Q    When you interviewed him you asked him what happened,

25  right?

50

Patesh - People - Direct

1    A    No problem.  Yes, sir.

2    Q    You are not store security, correct?

3    A    No, I'm not, sir.

4    Q    You said that there's a policy in place for a situation

5    when an employee, like yourself, sees somebody shoplifting,

6    correct?

7    A    Correct.

8    Q    By the way, you -- what would be your job description?

9    A    I'm a sales associate

10    Q    So you're one of those guys who walks up and down the

11    aisles and ask people if they need help, correct?

12    A    Correct.

13    Q    You wear an orange .

14    A    Correct.

15    Q    In this case, when you claim that you saw shoplifting,

16    you did not call the police, correct?

17    A    Correct.

18    Q    Is that because that's a store policy?

19    A    It's not a store policy.  It's like if we see

20    something, we address it.

21    Q    Well, you told the ladies and gentlemen of the jury

22    that you saw a handle of a gun.

23    A    Yes, sir.

24    Q    Right?

25    A    Yes, sir.

*Handwritten margin note (left side):* What is Home depots Policy on Reporting Theft?

*Handwritten note (bottom right):* 7 years employed? No Uniform?

lyc

60

Patesh - People - Direct

1          THE WITNESS:  Yes.  He wants to know where it is

2     at.

3          THE COURT:  Can you answer that?

4          THE WITNESS:  Sure.

5          THE COURT:  Go right ahead.

6     A    Certain spots that the cameras are not working properly

7     so...

8     Q    But you were able to see it back in March of 2011,

9     correct?

10    A    Yes.

11         THE COURT:  You mean you could see it, but you

12    couldn't download it?

13         THE WITNESS:  Correct.

14    Q    Okay.  So if I went to Home Depot now would I be able

15    to see that?

16         MR. MISOREK:  Objection.

17         MR. ROTHBERG:  No.

18         THE COURT:  I'm allowing it.

19    Q    Would I be able to see that if I went to Home Depot

20    now?

21         THE COURT:  Is it still preserved?

22         THE WITNESS:  Yes.

23    Q    Oh, it is?

24    A    I believe so, yes.

25    Q    You believe so?

lyc

Patesh - People - Direct

83

1      THE COURT:  Welcome back, everybody.

2      THE COURT CLERK:  Sir, you are still under oath to

3   tell the truth, okay?

4      THE WITNESS:  Yes, sir.

5      THE COURT:  Mr. Rothberg.

6      MR. ROTHBERG:  Just a couple of questions.

7   CROSS EXAMINATION CONTINUED

8   BY MR. ROTHBERG:

9      Q    I just want to go back for a second.

10          You said that the handle of the gun that you claim you

11   saw for a couple of seconds was black?

12     A    Yes, sir.

13     Q    Did you ever at any time tell the police that the gun

14   that you saw was a silver gun?

15     A    No, I did not.

16     Q    Okay.  One other point and then I'm going to be done

17   for now.

18          Who of the two individuals that you talked about, blue

19   hoody, camouflage jacket, who did you see putting items in their

20   pocket?

21     A    The gentleman in the camouflage jacket.

22     Q    Did you ever see the other individual putting items in

23   his pants or jacket or what have you?

24     A    No.

25     Q    Now, again, sir, you recall speaking to the police in

lyc

Patesh - People - Direct

1   what aisles to put the dummies in?

2                    MR. MISOREK:    Objection.

3         Q     How many aisles are in the store?

4         A     There are about 45 aisles.

5         Q     Of the 45 aisles can you tell us approximately how many

6   have dummies and how many have real?

7         A     I know of a couple of them that are real and the rest

8   are dummies, yes.

9         Q     Most are dummies?

10        A     Yes.

11        Q     Now, you -- did you tell the police that there was a

12  woman involved with this incident?

13        A     That I seen on camera, yes.

14        Q     So anything -- is this a fair statement, sir, anything

15  that you told the police regarding a female was not witnessed

16  firsthand by you, but was witnessed by you on the surveillance

17  video?

18        A     Correct.

19        Q     It is true that you told the police all about a third

20  person, a woman, correct?

21        A     That was seen on camera, yes.

22        Q     Right, entering the store, right?

23        A     No.

24        Q     No?

25        A     The lady was not entering the store.  She was outside

lyc

77

Patesh - People - Direct

1    the store.

2        Q    Okay.  Did you ever tell the police that defendant

3    Shaquanna Leslie also entered the above location and stood by the

4    front door?

5        A    She was at the food cart, at the front of the store.

6        Q    Okay.  My question is specific.

7             THE COURT:  Excuse me.  The food court?

8             THE WITNESS:  The food cart.  It is like a little

9    cart that has hot dogs.

10            THE COURT:  Is that in the store or outside of the

11   store?

12            THE WITNESS:  Outside of the store.

13       Q    Okay.  That's all well and good, but please answer this

14   --

15            MR. MISOREK:  Objection.

16            MR. ROTHBERG:  All right.  I strike that.

17       Q    Please answer this question for me, if you can.  Did

18   you ever tell the police that defendant Shaquanna Leslie also

19   entered the above location and stood by the front door?

20       A    Yes.

21       Q    You told them that?

22       A    Yes.

23       Q    So she did enter the store?

24       A    She did not enter the store.

25       Q    So then why did you tell them that she entered the

lyc

Patesh - People - Direct

1      A      In the pants.

2      Q      Was it in a holster or just in the pants?

3      A      No, in the pants.

4      Q      Now, is it a fair statement to say that you did not see

5    the entire gun?

6      A      Correct.

7      Q      You saw a handle of a gun?

8      A      Yes, sir.

9      Q      What color was the handle of the gun?

10     A      Black.

11     Q      It looked just like those ones on TV or...

12     A      I only saw the handle.  I cant tell you, you know, what

13   type it is.

14     Q      Right.  So like do you know the difference between, if

15   I asked you, between a revolver and an automatic pistol?

16     A      Yes.

17     Q      You do know?

18     A      Yes.

19     Q      How do you know that?

20     A      There's magazines.  You could read on them.  You see it

21   everyday.

22     Q      Okay.  What magazine?

23     A      The magazines on the -- there's magazine or on the

24   internet.

25     Q      Well, do you read such magazines?

Patesh - People - Direct

1    A    I told that the female was in the car with the other

2    two persons and when they came out, she came outside and stood

3    right by the food cart that was outside.

4    Q    Right.  And then what?  And then anything else?

5    A    And when the two gentlemen came outside, she end up

6    walking back to the car and they drove off.

7    Q    Okay.  But you didn't witness this firsthand, correct?

8    You didn't see any of that, right?

9    A    I saw it on camera, correct.

10    Q    Firsthand, with your own eyes?

11    A    No, sir.

12    Q    While it was happening, did you see any of that?

13    A    No, sir.

14    Q    Okay.  So you were able to look at -- right, I'm going

15    back to that day, March 25th, 2011 you were able to look at that

16    store security, right?

17    A    Yes.

18    Q    And you kind of like pieced it together, right?  Did

19    you?

20    A    No, I didn't piece it together.

21    Q    Well, you're telling us -- you told the police that a

22    woman came with the blue hoody guy and the camouflage jacket, you

23    told that all to the police, right?

24    A    Correct.

25    Q    You don't want to say you pieced it together, but you

1yc

84

Patesh - People - Direct

1    this case, right?

2        A    Yes.

3        Q    They asked you what happened and you told them what

4    happened?

5        A    Yes.

6        Q    Incidentally, do you recall specifically the names of

7    any police officers that you spoke to?

8        A    No.

9        Q    Well, if I told you Police Officer Joseph Caserta does

10    that ring a bell to you or no?

11        A    No.

12        Q    Okay.  How many police officers did you speak to in

13    total, do you remember?

14        A    It was a couple of them because when they had made the

15    call, couple officers came.

16        Q    Okay.  But you did speak to police officers and you

17    tried to be as accurate as you could when relaying what happened

18    in the case, right?

19        A    Yes.

20        Q    You never said silver handgun to any police officer,

21    right?

22        A    No, sir.

23        Q    Did you ever --

24            MR. ROTHBERG:  Bear with me one second.

25            (Whereupon, there is a brief pause in the

161

PO Caserta - People - Cross

1  11:35, does that mean that's the time when somebody placed a call

2  to 9-1-1?

3      A    That's the time when we receive the radio run.  I look

4  down at my watch and I write down the time.

5      Q    Is that generally about the time somebody calls 9-1-1?

6  I mean you should get the call right away, right?

7              MR. MISOREK:  Objection.

8              THE COURT:  I will let you answer.

9      A    If someone calls the police we get the call, yes.

10              MR. ROTHBERG:  Judge, if I could just have a

11  second to speak to Mr. Lowery.

12              (Whereupon, there is a brief pause in the

13  proceedings.)

14      Q    Did Mr. Palesh tell you that he was a security officer?

15      A    He said he was in part of the loss prevention.

16      Q    I don't know what that means.  Did he tell you he was a

17  security officer?

18      A    The loss prevention officer.

19      Q    You did swear to the fact that he told you he was a

20  security officer, right?

21      A    It's a loss prevention officer at Home Depot.  They are

22  called loss prevention officer.

23      Q    That's what he told you.  What is a loss --

24      A    Loss prevention is kind of like security of a place,

25  but it's labeled as loss prevention.

lyc

PO Caserta - People - Cross/Redirect

1    Q    He didn't tell you he was just a clerk?

2    A    No.

3         MR. ROTHBERG:  That's all I have.

4  REDIRECT EXAMINATION

5  BY MR. MISOREK:

6    Q    Just to be clear, do you remember Mr. Rothberg asking

7  questions about the radio communications you received?

8    A    Yes, sir.

9    Q    Do you actually, over your radio, hear the 9-1-1

10 caller?

11   A    No, we do not.

12   Q    Who do you hear?

13   A    We hear cental, which is dispatch.

14   Q    That's a New York City Police Department dispatcher?

15   A    Yes, sir.

16   Q    You remember Mr. Rothberg asking you a number of

17 questions involving the Criminal Court complaint, yes?

18   A    Yes, sir.

19   Q    The statement you discussed, during the fingerprinting,

20 did you include that in your Criminal Court complaint?

21   A    Yes, sir.

22   Q    Were you informed, without discussing what the

23 statements were, were you informed of any other statements?

24   A    Yes, sir.

25   Q    Who informed you, again without discussing them, who

PO Caserta - People - Cross

1        THE WITNESS:  Palesh said that Mr. Lowery was the
2   one stuffing the stuff in his pockets.
3        Q    He didn't name Lowery?
4        A    I apologize.  I apologize.
5        Q    Am I correct?
6        A    100 percent.  I apologize.
7        Q    He didn't know Matthew Lowery.
8        A    I apologize for that.  You are 100 percent correct.
9        Q    Thank you for that.  He said both of the males,
10  camouflage blue hoody, both of the males were stuffing their
11  pockets with merchandize, did he tell you that?
12       A    No, sir.  No, sir.
13       Q    Okay.  Did you indeed swear to that fact though that he
14  told you that, that both of the males were stuffing their
15  pockets?
16       A    On the day that I spoke to the District Attorney I
17  informed them what both people said so it might have gotten
18  misconstrued with what I was trying to relay.
19       Q    Again, again, please sir.  I know you're trying and I'm
20  not being combative with you.
21       A    Not at all, sir.
22       Q    Please answer my questions.  Did you swear in a
23  Criminal Court complaint that Palesh told you that both of the
24  males were stuffing their pockets?
25       A    Could I see that, please?  I apologize.

The complaint is shown to the cop

PO Caserta - People - Cross

1      Q      You may.  You may.

2             (Whereupon, there is a brief pause in the

3      proceedings.)

4             THE WITNESS:  Judge, I'm just going to look this

5      over.

6             THE COURT:  Sure go ahead.

7             (Whereupon, there is a brief pause in the

8      proceedings.)

9      A      Yes, sir.  Thank you, sir.

10     Q      Okay.  Is that yes, sir in response to my question or

11     is that yes, sir, what's the next question?

12     A      Mr. Patesh told us that Lowery -- excuse me -- that the

13     gentleman in the camouflage jacket was stuffing things in his

14     pockets.

15     Q      What about the other person?

16     A      That he was the look out.

17     Q      Okay.  So my question to you, if that's what he said,

18     my question to you is, why did you swear in a complaint that he

19     told you that they were both stuffing their pockets?

20     A      Like I said, sir, with all the paperwork and with all

21     the talking to the District Attorneys, the following day, some of

22     the things of what the two complaints -- because it's not just

23     one -- get misconstrued.  If I messed up on that I apologize, but

24     everything I have done --

25     Q      Well, did you mess up on this?  Would you agree with

lyc

PO Caserta - People - Cross

1   me, would you agree with this, that you swore, whether you made a

2   mistake or not, that's another issue, but would you agree with me

3   that you swore in a complaint that Palesh told you both of the

4   people were stuffing their pockets?  Would you agree with that?

5        A    Yes, sir.

6        Q    Okay.  Now, you're telling the members of the jury that

7   it was a mistake?

8        A    Absolutely.

9        Q    But you did swear to it on --

10            THE COURT:  Asked and answered.  Asked and

11   answered.

12       Q    -- on May 26th, correct?

13            THE COURT:  Sustained.  Sustained.

14       Q    Okay.  Well, when did you swear to this complaint?

15       A    I'm sorry, sir?

16       Q    When did you swear to the complaint?

17       A    The following day.

18       Q    So on the following day you swore to that fact.  Now,

19   you're telling us now, right, almost two years later that that

20   was a mistake, okay.  When for the first time did you tell

21   somebody that you had made a mistake in an accusatory instrument,

22   the factual portion of an accusatory instrument that charges

23   someone with a very serious crime, when did you tell somebody

24   that you made a mistake?

25       A    Like I said, sir, for me that is not making a mistake.

malice

lyc

155

PO Caserta - People - Cross

1   That is trying to get all the factual evidence and if I perhaps

2   might have put something in there, I did not do that with any

3   mal-intention or anything like that.

4       Q    I'm not saying you did.  I'm really not saying you did,

5   okay.  But nevertheless, I have a question that you haven't

6   answered yet, and that is, when for the first time did you tell

7   somebody that you made a mistake and swore to something that

8   wasn't true?

9               MR. MISOREK:  Objection as to untrue.

10              THE COURT:  Yeah.  Sustained.

11      Q    Well, that you swore to something that was not

12  accurate?

13              MR. ROTHBERG:  Is that okay, Judge?  I'm not be

14      facetious.

15              THE COURT:  Did you ever read the complaint again

16      and say that this was a mistake?

17              THE WITNESS:  No, sir.

18              THE COURT:  That's what he wants to say.  He said,

19      no.

20      Q    Well, do you have it written down anywhere that -- you

21  know what, withdrawn.

22              Okay.  Did you question Mr. Patesh about a gun.

23      A    He told me there was a gun.

24      Q    He told you there was a gun.  As a matter of fact, he

25  told you the color of the gun that he claims he saw; isn't that

lyc

~PO Caserta - People - Cross

1   correct?

2      A    Yes, sir.  Silver.

3      Q    Silver, right?

4      A    Yes, sir.

5      Q    Thank you.



6              THE COURT:  I will clear this courtroom.  Do you

7   understand me back there?  One more reaction.  I apologize

8   Mr. Rothberg.  Continue.

9      Q    And he told you that on March 25th?

10     A    Yes, sir.

11     Q    Correct?

12     A    (Whereupon, the witness nods head up and down.)

13     Q    By the way, did he tell you whether or not he saw the

14  whole gun or part of a gun?

15     A    He said that he was flashed, it was a gun and that it

16  was a silver gun.

17     Q    Flashed a gun?

18     A    Flashed a gun.

19     Q    He didn't say that he saw a part of it or anything like

20  that?

21     A    No, sir.  Flashed a gun.

22     Q    When for the first time on March 25th, of 11, did you

23  see Mr. Lowery?

24     A    If I could just refer -- I apologize.

25              THE COURT:  What time?

# T L Services Investigations, L.L.C.

Thomas J. LoFrese, P.I.
John G. Whittall
Investigations, Accident Reconstruction

Ed Muccini, Esq.
44-37 Douglaston Parkway
Douglaston, NY 11363

RE:   People vs. Daniel Taylor

## Report                    June 7, 2011

**INSTRUCTIONS: Full investigation into the circumstances of this case.**

## INVESTIGATION:

The file was reviewed and our agent, Kathleen Abitabile, went to the Home Depot 92-30 168th Street, Jamaica, NY.  Please note that Kathleen is a retired Detective Specialist from the NYPD and retired from Gang Intelligence in 2006. She has been working with us in investigations since her retirement. She talked with the store manager and tried to get Eric Gonzalez's schedule and related information. The next day she visited the assistant manager of the store, Evan Clark.  She took photos inside the store of the areas involved and to show that there was a video system in place.  She verified that it was in place at the time of the alleged incident.  A subpoena was prepared for Home Depot to obtain a copy of the video surveillance.  Our agent returned to the store and Evan Clark, asst. store manager, accepted service and advised that he would give it to A. Marique the director of loss prevention.

It was difficult to make arrangements to meet with Eric Gonzalez, because A. Marique was on vacation and was the only person who could give information on Mr. Gonzalez.  Home Depot assigned the case to Penny Glass, the regional manger of loss prevention.  Numerous calls were made to Ms. Glass on this matter.




3280 Sunrise Highway, Suite 212, Wantagh, NY 11793
(516) 816-0274 • Fax (516) 706-0283

Penny Glass finally called and told us that Eric Gonzalez told her he did not see any men with guns. The following day our agent finally met with Eric Gonzalez and he said that the sales assistant, Patefh Roger Partap, who had been with the company six years, saw the whole incident. Our agent talked with Mr. Partap and he stated to our agent that he thought he saw two men shoplifting or acting suspiciously so he walked up the aisle in plumbing. He approached Matthew Lowery and said I saw you take that pipe. Matthew Lowery turned around and opened his jacket and showed him a gun. Lowery was wearing camouflage and also said, "I live around here so make like you never saw anything or I'll be back to get you." Patef then said that the man in the blue jacket was innocent and have never shown a gun or threatened him. He felt that by the expression on Taylor's face he was unaware that Lowery was engaging in anything criminal at that time.

Our agent was given a video, which we reviewed. The video only shows Lowery and Taylor entering the store. In the video Taylor is next to Lowery, but as they proceed up the aisle he walks much faster that Lowery, who is pushing a cart, and walks well ahead. There was no video in the plumbing aisle. From what can be seen in the video it backs up what Mr. Taylor claims happened Mr. Partap would make an excellent witness for the defense of Mr. Taylor.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**

-------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK,

                              Plaintiff,                          **AFFIDAVIT**

          -against-                                              CASE 2011QN016528

DANIEL TAYLOR,

                              Defendant.

-------------------------------------------------------------------X

I, KATHLEEN ABITABILE being duly sworn hereby state that I am 47 years old and reside in the County of Nassau and employed by TL Services Investigations LLC and that I had been assigned to assist on the investigation into the case People of the State of New York vs. Daniel Taylor. I am a retired from the New York City Police Department and have been working with TL Services Investigations LLC since my retirement.

In the course of this investigation I was required to interview Patefh Roger Partap, who was born April 12, 1976 and resides at 90-07 186th Street, Jamaica, NY having phone number 347-845-3663. I found him to be a creditable witness. He stated that he has been in this country since 1991 from Trinidad and has been employed by the Jamaica, NY Home Depot for six years. His manager had provided me with the contact information about him and stated that he was a reliable employee.

During my interview with him I asked for him to describe the events that took place at the Home Depot on March 25, 2011 in the plumbing aisle involving Matthew Lowery and Daniel Taylor. He freely stated to me that he thought he saw two men shoplifting or acting suspiciously so he walked up the aisle in plumbing. He approached Matthew Lowery and said I saw you take that pipe. Matthew Lowery turned around and opened his jacket and showed him a gun. Lowery was wearing camouflage and also said, "I live around here so make like you never saw anything or I'll be back to get you." Patef then said that the man in the blue jacket was innocent and have never shown a gun or threatened him. He felt that by the expression on Taylor's face he was unaware that Lowery was engaging in anything criminal at that time. He also said that the Eric Gonzalez supplied the police with all information. because he is in loss prevention and it is Home Depot's policy for him to provide all information to the police.

Kathleen Abitabile, being first duly sworn on oath according to law, deposes and says that she has read the foregoing AFFIDAVIT subscribed, that the matters stated herin are true to best of her information and knowledge and belief.

*Kathleen Abitabile*
Kathleen Abitabile

Subscribed and Sworn to before me this 13th day of June, 2011

THOMAS JOHN LoFRESE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01LO4671512
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES FEB. 28, 2015

VOID
False caption
No proof, not even
no neill "

Q11617651

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR, COUNTY OF QUEENS

THE PEOPLE OF THE STATE OF N  STATE OF NEW YORK
COUNTY OF QUEENS

v.

MATTHEW LOWERY
        DEFENDANT

Case Dismissed NOV

POLICE OFFICER JOSEPH CASERTA OF 103RD PRECINCT, TAX REG#: 943059,
BEING DULY SWORN, DEPOSES AND SAYS THAT ON OR ABOUT MARCH 25 2011 AT
ABOUT 1:15PM, AT THE INTERSECTION OF 107 AVENUE AND 160 STREET, COUNTY
OR QUEENS, STATE OF NEW YORK —

THE DEFENDANT COMMITTED THE OFFENSES OF:
PL 110/125.25-1 ATTEMPTED MURDER IN THE SECOND DEGREE
PL 120.10-1 ASSAULT IN THE FIRST DEGREE
PL 265.02-1 CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE

IN THAT THE DEFENDANT DID:  WITH INTENT TO COMMIT THE CRIME OF MURDER
IN THE SECOND DEGREE AND TO CAUSE THE DEATH OF ANOTHER PERSON, ENGAGE
IN CONDUCT WHICH ATTEMPTED TO CAUSE THE DEATH OF SUCH PERSON OR A THIRD
PERSON;WITH INTENT TO CAUSE SERIOUS PHYSICAL INJURY TO ANOTHER PERSON,
CAUSE SUCH INJURY TO SUCH PERSON OR A THIRD PERSON BY MEANS OF A DEADLY
WEAPON OR DANGEROUS INSTRUMENT;COMMIT THE CRIME OF CRIMINAL POSSESSION
OF A WEAPON IN THE FOURTH DEGREE AS DEFINED IN SUBDIVISION ONE, TWO,
THREE OR FIVE OF SECTION 265.01 OF THE PENAL LAW AND WAS PREVIOUSLY
CONVICTED OF ANOTHER CRIME

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S
BELIEF ARE AS FOLLOWS:

DEPONENT STATES THAT AT THE ABOVE MENTIONED DATE, TIME, AND PLACE OF
OCCURRENCE, HE RESPONDED TO A RADIO RUN OF A STABBING AND THAT THE
CALLER WAS IN A CHEVY BLAZER.

DEPONENT FURTHER STATES THAT UPON UPON ARRIVING TO THE ABOVE MENTIONED
LOCATION, HE OBSERVED A TWO-TONE CHEVY BLAZER PARKED AT 107 AVENUE AND
160 STREET IN QUEENS COUNTY, AND FURTHER STATES THAT HE OBSERVED THE
COMPLAINANT, DANIEL TAYLOR AND APPREHENDED OTHER, SHAQUANA LESLIE
(ARREST #Q11617604) EXIT SAID VEHICLE.

DEPONENT FURTHER STATES THAT HE OBSERVED A PUNCTURE WOUND ON THE
COMPLAINANT'S FACE, AS WELL AS BLEEDING ON THE COMPLAINANT'S FACE.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT HE WAS THE PERSON
WHO CALLED 911 ABOUT BEING STABBED AND THAT THE DEFENDANT, MATTHEW
LOWERY, CUT HIM.

*Case Dismissed*

LOWERY,MATTHEW  011617451

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE DEFENDANT REPEATEDLY STABBED THE COMPLAINANT WITH AN ICE PICK AFTER THEY FOUGHT OVER A HOME DEPOT STORE CREDIT FOR STOLEN MERCHANDISE.

DEPONENT FURTHER STATES THAT HE OBSERVED SEVERAL PUNCTURE AND OPEN STAB WOUNDS ABOUT THE COMPLAINANT'S SHOULDER, ARMS, STOMACH AND CHEST, AND FURTHER STATES THAT THE COMPLAINANT WAS BLEEDING FROM SAID INJURIES.

DEPONENT FURTHER STATES THAT THE COMPLAINANT BEGAN TO HAVE TROUBLE BREATHING NORMALLY, AND BECAME FAINT.

DEPONENT FURTHER STATES THAT HE TRANSPORTED THE COMPLAINANT TO A LOCAL AREA HOSPITAL TO TREAT SAID INJURIES.

DEPONENT IS FURTHER INFORMED BY DR. SMALLS OF A LOCAL AREA HOSPITAL THAT THE COMPLAINANT NEEDED SEVERAL STITCHES TO CLOSE SAID STAB AND PUNCTURE WOUNDS, AND THAT THE COMPLAINANT ALSO SUSTAINED A COLLAPSED LUNG (PNEUMOTHORAX).

DEPONENT FURTHER STATES THAT HE OBSERVED SAID DOCTOR INSERT TUBING INTO THE COMPLAINANT'S LUNG AND DRAIN BLOOD OUT OF THE COMPLAINANT'S LUNG.

DEPONENT FURTHER STATES THAT THE COMPLAINANT WAS ADMITTED INTO SAID HOSPITAL FOR FURTHER TREATMENT.

DEPONENT FURTHER STATES THAT THE DEFENDANT ADMITTED IN SUM AND SUBSTANCE THAT HE AND THE COMPLAINANT GOT INTO A FIGHT AND THAT HE STABBED HIM.

DEPONENT FURTHER STATES THAT HE HAS EXAMINED AND REVIEWED A COPY OF THE DEFENDANT'S CRIMINAL RECORDS AS MAINTAINED BY THE NEW YORK STATE DEPARTMENT OF CRIMINAL JUSTICE SERVICES, THAT SAID RECORDS WERE MADE IN THE REGULAR COURSE OF SAID BUSINESS AND THAT IT WAS THE REGULAR COURSE OF SUCH BUSINESS TO MAKE IT AT THE TIME OF THE ACT, TRANSACTION, OCCURRENCE OR EVENT, OR WITHIN A REASONABLE TIME THEREAFTER, AND THAT SAID RECORDS INDICATE THAT THE DEFENDANT WAS CONVICTED OF PENAL LAW SECTION 120.00-1 ASSAULT IN THE THIRD DEGREE ON DECEMBER 15, 2009 UNDER DOCKET NUMBER 2009QN054399 IN QUEENS COUNTY.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW

3/26/11    PC

DATE    SIGNATURE

SWORN TO BEFORE ME ON THE DAY OF

DATE    SIGNATURE

**Certificate of Service**

**Lowery V. Home Depot USA, et al.,**

13-CV-3957 (JPO) (SDNY)

I Matthew Lowery DIN#, do declare under penalty of perjury the following:

That on the _30_ day of _July_____, 2013 that I did mail One (1) Copy of Motion for leave to file an amended complaint, Affidavit in Support, and Memorandum of Law in Support, with amended Complaint, by placing such in the Box marked U.S. Mail at Great Meadow C.F. for delivery to the following Party:

Corporation Counsel of the City of New York, 100 Church Street, Rm. 3-157, New York, NY 10007.

Pro Se Office, U.S. District Court, Southern District of New York, 500 Pearl Street, Room 230, New York, NY 10007.

Honorable J. Paul Oetken, United States District Judge, U.S. District Court for the Southern District of New York, 500 Pearl Street, , New York, NY 10007-1312.

Home Depot USA, 92-30 168th Street, Jamaica, NY 11433

(Sworn) I do declare under penalty of perjury the foregoing is true and correct

X_____

Sworn to before me this                                     Matthew Lowery,

_30_ day of _July_____, 2013                      DIN# 13-A-1581

_Robert H McCauly_

Notary Public

Robert H. McCauley
Notary Public, State of New York
Qualified in Washington Co. No. 01MC8276248
My Commision Expires February 11, 20__

18



Matthew Lowery 85A1584
Box 51
Great Meadow Correctional Facility
Comstock, N.Y. 12821-0051

RECEIVED
PRO SE OFFICE
AUG 5 2013

USM PS
SDNY

To Se Office U.S DS
Southern District of New
500 Pearl Street Room
New York, N.Y. 10007